**ASHEVILLE TOBACCO BOARD OF TRADE, INC., a Corporation, et al., Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 8288.

United States Court of Appeals Fourth Circuit.

Argued June 19, 1961.

Decided Sept. 20, 1961.

Harold F. Baker, Washington, D. C. (Richard L. Perry and Howrey, Simon, Baker & Murchison, Washington, D. C., on brief), for petitioners.

J. B. Truly, Attorney, Federal Trade Commission, Washington, D. C. (James McI. Henderson, General Counsel, and Alan B. Hobbes, Asst. General Counsel, Federal Trade Commission, Washington, D. C., on brief), for respondent.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

This petition for review of an order of the Federal Trade Commission brings before the court for the second time certain regulations or bylaws adopted by the Asheville Tobacco Board of Trade, Inc., to control the purchase and sale of tobacco on the tobacco market at Asheville, North Carolina. In our prior decision on January 20, 1959, Asheville Tobacco Board of Trade, Inc. v. Federal Trade Commission, 4 Cir., 263 F.2d 502, 506, we reviewed an order entered by the Commission on February 14, 1958, which

directed the Board to cease and desist from carrying out in certain respects a plan for the regulation of the tobacco market in Asheville which the Board had devised. We held that there was substantial evidence to support the Commission's order in some respects, but remanded the case for further proceedings in respect to a provision of the order which seemed to us ambiguous and also in order that the Commission might give further consideration to certain questions discussed in our opinion. In response to the remand the Commission, after extensive consideration, entered an order on October 18, 1960, which is now before us for review.

As will appear from our former opinion, the regulations of the Board which gave rise to the first order of the Commission were passed in an effort to solve a problem caused by the activities of one C. T. Day, an independent buyer of tobacco and a member of the Board, who announced on January 14, 1954 that he intended to build a new warehouse in Asheville, containing 125,000 feet of floor space, much larger than any of the eleven existing warehouses in the city which had a total floor space of 475,182 sq. ft. Under the regulations of the Board then in existence selling time for the auctions conducted in the Asheville warehouses was allotted amongst them in proportion to their respective floor space; but the Board became apprehensive that a building war would take place in view of Day's announcement, which he actually carried out in 1954. "Consequently, (as we said in our opinion, 263 F.2d 502, 506) on October 2, 1954, the Board adopted new bylaws which (1) discarded the floor space system, (2) adopted a modified 'performance system' for the allotment of selling time to existing warehouses, and (3) set up a 'unit' system for the allocation of selling time upon the entry of a new warehouse. Under a pure performance system selling time is allotted to each warehouse in direct proportion to producers' sales in such warehouse during the year preceding the allotment. The Board, however, modified the per-formance system by a 'gain or loss proviso': that the selling time allotted to any warehouse shall not vary more than 3½% from the selling time allotted to such warehouse for the preceding season. The 'new warehouse proviso' adopted by the Board allots to a new warehouse a unit of selling time equal to the average of the selling times of all warehouses on the market, unless the new warehouse is smaller than the average, in which event its allotment is reduced.

"After the meeting, the Board of Directors allotted selling time for the 1954 season in accordance with the new bylaws. Since Day's new warehouse raised to twelve the number on the market, it was allotted 8.33% of the selling time, i. e. one-twelfth of the total time available, although it contained 20.83% of the total selling space. The remainder of the time was divided among the other warehouses in accordance with their sales during the 1953 season."

After this allocation of selling time, Day filed a suit against the Board in the State court of North Carolina to restrain the enforcement of the new regulations, but the suit was unsuccessful. See Day v. Asheville Board of Trade, 242 N.C. 136, 87 S.E.2d 18. He then lodged a complaint with the Federal Trade Commission and after a hearing the Commission issued its order of February 14, 1958, wherein it required the Board to cease and desist from using any plan which:

"1. Allots selling time to new entrant warehouses on the Asheville tobacco market on any basis or in any manner which fails to take into account and give reasonable credit for the full size and capacity of a new entrant;

"2. Limits the possible gain or loss in selling time allotted to any warehouse, under the performance system or any other system, for any one selling season to 3½%, or any other specific percentage, of the selling time so allotted to such warehouse for the preceding selling season; or

"3. Has the purpose or effect of foreclosing or preventing any new entrant warehouse on the Asheville tobacco market, or any other warehouse doing business on that market, from competing therein on a fair and equal basis."

We reviewed this order upon petition of the Board in our earlier decision and reached the following conclusions.

(1) The Commission was clearly justified in condemning the modification of the performance system adopted by the Board whereby the gain or loss in selling time allotted to any warehouse for any one season was limited to 3½% of the selling time allotted to the warehouse for the preceding season.

(2) We pointed out that the Commission had not disapproved the performance system as opposed to the floor space system, and we showed that if a performance system is based on business done in the past some provision must be made when a new warehouse is built. We added that the provision made by the Board for a new warehouse might be a reasonable restraint of trade if combined with some reasonable gain or loss provision. We suggested that a performance system should be so planned that it would neither allow existing owners to prevent the erection of desirable new warehouses nor encourage overbuilding, and that in considering the reasonableness of such a regulation it would be proper to take into account the fact that free time acquired by a warehouse may furnish a new warehouse with a reasonable opportunity for expansion under the performance system.

(3) We pointed out that the Supreme Court of North Carolina, in its decision, had considered and approved the new warehouse provision and we suggested, while holding that this decision is not binding upon the Commission, that it should be considered in reaching a final conclusion.

(4) Finally, we showed that the first paragraph of the Commission's order, which held that any plan was invalid which allots selling time to a new warehouse on any basis which fails to take into account the *full* size of the warehouse, raised a doubt in our minds whether it required that credit be given for the *full* size of the new warehouse or that such size should be taken into account in determining the allotment of time. Accordingly, we remanded the case to the Commission for further proceedings in order that it might correct this ambiguity and give further consideration to the questions discussed in the opinion.

Upon the remand, the Commission gave consideration to our decision and filed an opinion and a tentative order with leave to the Board to object. Objections together with an offer of proof of subsequent developments on the Asheville tobacco market were filed, and thereupon the Commission reopened the proceeding and additional evidence was taken. Finally, on October 18, 1960, the Commission issued an opinion and a modified order wherein it ordered the Board to cease and desist from adopting any plan which:

1. Allots selling time to new entrant warehouses on the Asheville tobacco market on any basis or in any manner which fails to take into account and give reasonable credit for the size and capacity of a new entrant;

2. Limits the possible gain or loss in selling time allotted to any warehouse for any one selling season to 3½%, or any other unreasonably low percentage, of the selling time allotted to such warehouse for the preceding selling season, or in any other manner unreasonably limits the possible gain or loss in selling time allotted to any warehouse.

3. Has the purpose or effect of foreclosing or preventing any new entrant warehouse on the Asheville tobacco market, or any other warehouse doing business on that market, from competing therein on a fair and equal basis.

It will be observed that in its new order, the Commission removed the ambiguity from its prior order but maintained and reasserted its former position to the extent of (1) requiring that reasonable credit be given to the size and

capacity of a new entrant; (2) prohibiting a gain or loss provision limiting any warehouse to 3½% or any other unreasonably low percentage of the allotment of selling time for the preceding season or in any other manner unreasonably limiting the possible gain or loss in selling time allotted to any warehouse; and (3) prohibiting restrictions which prevent a warehouse from competing on a fair and equal basis. The Commission eliminated its former prohibition against limiting the selling time to any specific percent of the selling time allotted for the preceding season and gave its approval to a reasonable limitation of gain or loss in this respect.

The Commission also ordered the Board to file with the Commission a report in writing within sixty days setting forth in detail the manner and form in which they had complied with the order.

The Board, in the pending proceeding for review, reiterates its original argument that its regulation is reasonable and valid, and makes the additional contention that the new cease and desist order of the Commission should not be sustained because it disregards the holding of this court in its earlier opinion and fails to take into account the additional evidence offered to the Commission upon the remand of the case. The principal developments that have taken place in the Asheville market since the promulgation of the Board's regulation in 1954, may be summarized as follows.

Two new warehouses have been constructed, to wit, the New Burley warehouse in 1956, containing 42,596 sq. ft. of floor space and the Day No. 2 warehouse in 1957, containing 52,702 sq. ft. of floor space or a total of 95,298 sq. ft. These buildings are in addition to the warehouse erected by Day in 1954, which contains 126,484 sq. ft. The New Burley warehouse was erected by Adams & King to take the place of the Big Burley warehouse which they rented, but lost when it was bought by Day, who refused to renew the lease and operated the warehouse himself together with his other 2 warehouses in the selling season of 1958–1959.

Day now has a total area of 218,915 sq. ft. in his three warehouses, or 42.29% of the total sq. footage in the Asheville market.

During the same period from 1956–1960, five old warehouses with a total sq. ft. of 180,263 sq. ft. have been withdrawn from the market. The result is that there are now 9 warehouses with a total sq. ft. area of 517,807 sq. ft. as compared with 12 warehouses in 1954 with 611,326 sq. ft. The average sq. ft. area of the warehouses has increased from 42,198 sq. ft. to 57,520 sq. ft.

Changes have also taken place in the number of warehouse operators and their ranking in terms of sales. There are now four operators as compared with five in 1954. The operator who ranked first with 30.24% of the market in 1954 now ranks fourth with 18.03%. The operator that ranked second (Day) with 20.19% in 1954, now ranks first with 27.78%, and so forth. Thus, it appears that in 1954 Day, who then had 20.83% of the floor space, had 8.33% of the selling time, and in 1959–1960 he had 42.29% of the floor space and 27.78% of the selling time.

Having been held to an allocation of 8.33% of the total time in 1954, as a result of the application of the new warehouse provision, and having received an allocation of only 8.64% of the total time in 1955, as a result of the application of the 3½% gain or loss proviso, Day increased his allocation of time by constructing a new warehouse in 1957, and taking over the Big Burley warehouse from Adams & Hill in 1958. This action on his part and the withdrawal of four competing warehouses from the market enabled him to secure the larger percentage which he finally obtained.

The availability of free time to the several operators and the amount used by them has varied from year to year. For example, in 1956–1957, when Day had 19.8% of the floor space he was able to get 19.03% of the free time, but in 1958–1959, when he had 38.2% of the floor space, he got only .01% of the free time. His average for 5 years was 10.24% of the free time.

It now seems obvious the size of a new warehouse does not control the amount of free time which the operator is able to obtain. In 1956–1957, when Day had only one warehouse, his allotted time was 8+% but the amount of his free time was 20.29% due to the fact that the farmers were bringing a large amount of their tobacco to his warehouse so that the other warehouses did not use their full allotments and free time became available. In 1957–1958, on account of his second warehouse, Day's allotted time was 16.68% but the amount of free time available was 8.77%. In 1958–1959, when Day acquired a third warehouse formerly occupied by other tenants, his allotted time was 27.65% and the entire amount of his free time available was only 4.13%. In this year, Day received only .01% of the free time available. It is most likely that little free time would be available to a new warehouse coming into the Asheville market under the present conditions.

The Commission found upon substantial evidence that the business prospects of the Asheville market are good. It pointed out that the new Day warehouses offered the best selling facilities to the farmers and that this fact, coupled with Day's efficiency, enabled him to establish himself firmly in the market. The Commission also made the following findings as to the potentialities of the market as well as its actual operations in the 1959–1960 season:

"The uncontradicted testimony of Mr. William P. Hedrick, a well informed witness in his position as Tobacco Marketing Specialist of the North Carolina Department of Agriculture, was that in 1955 about 19.5 million pounds of burley tobacco were grown in western North Carolina, and that the potential of the Asheville market is 15 to 18 million pounds per year. In 1955, however, only about 9.2 million pounds of tobacco were sold on the Asheville market, and the greatest volume ever sold there was about 11.5 million pounds in 1954. Further, there is substantial and reliable evidence that the addition of the new warehouse in 1954 benefited the farmers and the market as a whole. Not only did new competition result in better and more efficient service to the farmers by the established warehousemen, but respondent Adams conceded that the new competition had benefited the market generally. Mr. Hedrick testified that 'additional warehouse space' in the burley tobacco area is an advantage, and that the burley markets, including Asheville, that have shown increases in volume are those where additional facilities have been added. He also testified that 'The farmers have benefited through increased competition, competitive operations among the warehousemen.' "

■ The evidence also showed and the Commission found that every warehouse operating in the Asheville market during the 1959–1960 auction was utilized for the selling of tobacco and that, at the beginning of the sale, all of the warehouses, with possibly one exception, were full of tobacco. One warehouse was in such poor condition as to be unfit for the sale of tobacco but was nevertheless used in this season. It was testified that there was no over-expansion of the Asheville market and that the congested condition which existed in the first part of the season could occur again in the following year. Taking into account the fact that the total floor space area had been reduced by 93,625 sq. ft. during the period under examination, the congested condition of the market in 1959–1960, and also, the potentialities of the farming area, the Commission reached the conclusion that there had been no overbuilding but that there was reason to apprehend a shortage of floor space in the future, if the restrictive regulations should be enforced.[1]

1. In reaching its conclusions, the Commission took into consideration the testimony as to the changes in the condition of the Asheville tobacco market and other testimony upon which the Board relies, including the evidence of certain of-

The Board on its part reads the evidence outlined above as vindicating its position. It urges that the event shows that the new warehouse provision, even with its 3½% limitation upon gain or loss of selling time, has not interfered with the erection of desirable new warehouses or prevented a new operator from taking a commanding position in the market, and yet has prevented excess building of unnecessary new facilities. We do not think, however, that this conclusion necessarily follows or that the evidence demonstrates the reasonableness of the Board's regulations. That which has occurred may well be attributable, as the Commission has found, to the erection of new and improved facilities upon the market which have brought substantial business to the owner in spite of the limitations of the regulation. Doubtless Day was aided in accomplishing this result by the inadequacy of the old buildings; but it does not follow that a future operator desiring to enter the market would have the same success. We are still of the opinion that the Commission was justified upon the evidence in condemning the drastic restriction of 3½% on the acquisition of additional selling time which was adopted by the Board for the express purpose of minimizing competition as far as it was possible to do so. We do not mean to say that no limitation on the acquisition of new selling time can be validly imposed. Indeed, we suggested in our earlier decision that the Board's new warehouse provision might constitute a reasonable restraint of trade if accompanied by a reasonable gain or loss provision with respect to the acquisition of new selling time; and the Commission has adopted our suggestion to the extent

of recognizing in its last order that a plan will be valid which gives reasonable credit for the size of a new entrant and does not contain an unreasonable limitation on gain or loss of selling time. In order to make its order effective, the Commission has directed the Board to frame and file such a plan, thereby inviting the Board to devise such plan as would be reasonable in its judgment.

The general position of the Commission is indicated by the following excerpt from its last opinion which is supported by substantial evidence. The Commission said:

"The Commission has given full consideration to the Court's discussion of the new warehouse provision of the Board's regulations, which provision caused the Commission to include the first paragraph in its order. The provision precludes taking into consideration, as a factor in determining the allotment of selling time to a new warehouse, the size and capacity of the warehouse over and above the average size and capacity of all other warehouses on the market. The Court held that the evidence supports the Commission's condemnation of the provision when used in combination with the 3½% gain or loss provision, but stated that 'it is not so clear that the new warehouse provision itself, or combined with a reasonable gain or loss provision, would unduly tend to restrain trade or constitute an unfair practice or an unfair method of competition.'

"As the Court noted, the decisive question of whether a restraint of trade is unreasonable, and therefore

ficials of the United States Department of Agriculture connected with the Tobacco Division of the agricultural market service of the United States to the effect that the Department was opposed to overbuilding and had control over the tobacco market through its power to limit the number of graders of the product without whom the sale of tobacco cannot take place. It was shown that the Asheville market had made no request for additional graders but it was also

shown that these witnesses had no personal acquaintance with the conditions in Asheville. It can hardly be said that the failure of the Asheville market to request additional graders is conclusive evidence as to the conditions which now exist in the market or which may come to pass in the future. In any event, the weight to be given to this evidence was a matter to be determined by the Commission as the trier of facts.

violates the antitrust laws, 'depends on the significance of the restraint in relation to the particular market under investigation.' Upon reconsideration of the relevant facts in the light of the Court's opinion, the Commission is convinced that the new warehouse provision constitutes an unreasonable restraint of competition on the Asheville tobacco market even if used alone or in combination with a reasonable gain or loss provision.

"The new warehouse provision was adopted by the Board in the face of the construction of a modern and efficient warehouse by a new competitor. At the time of its adoption there were eleven warehouses on the market, owned and operated by four firms. The purpose of the provision, the record shows, was not so much to restrict the construction of unneeded new facilities, but was to preserve in large measure the status quo on the market. The construction of new warehouse facilities is costly, and it is of course important to a new competitor that the size and capacity of his warehouse be taken into consideration—not for full credit but for reasonable credit—in determining his initial allotment of selling time. Unless reasonable consideration is given to size and capacity as a factor, the construction of desirable and needed facilities may be permanently discouraged. Clearly, it seems to the Commission, a provision which excludes size and capacity as a factor in allotting selling time to a new warehouse for the first year of its operation is unduly restrictive of competition.

"This, we think, is true even though, as the Court states, the competitive position of a new warehouse may be improved in subsequent years under the performance system by the utilization of free time, no matter what the initial allotment to the warehouse may be. There is no certainty, however, that an appreciable amount of free time will be available to a new warehouse. The record shows that new competition on the Asheville market in 1954 enlivened the market and resulted in improved and more efficient service by the established warehouses to the farmers. More vigorous competition for the farmers' business by all warehousemen may result in the utilization of all, or nearly all, their allotted selling time, thus practically freezing the allotted time of a new warehouse to its allotted time the first year of its operation.

"We emphasize that we do not intend by our order to foster or in any manner encourage overbuilding or uneconomic building of warehouses on the Asheville market. On the contrary, the Commission recognizes, as shown by its opinion in the Wilson case, that the addition of unnecessary warehouse facilities to a market is economically unsound and wholly undesirable."

In approving the Commission's conclusions, we accept the mandate of the Statute, 15 U.S.C.A. § 45(c), that the findings of fact of the Commission, if supported by evidence, shall be conclusive. Included in these findings are those which relate to the prospect of larger sales of tobacco on the Asheville market in the future, as indicated by the crowded conditions and the amount of business done in the 1959–1960 market and the business potential of the area as shown by the excess of tobacco grown in the area as compared with the Asheville sales, the probability that a shortage of floor space in the warehouses may occur in the future if reasonable consideration is not given to the size of a new warehouse or if an unreasonable limitation is imposed on gain or loss of selling time, and the uncertainty that a new warehouse may be able to acquire sufficient free time in addition to its allotment so that it may have sufficient selling time to dispose of the merchandise on hand.

The larger question, as to whether the probable effect of the regulation,

found as a fact by the Commission to be restrictive, will amount to a violation of the Statute as an unfair method of competition within the meaning of 15 U.S.C.A. § 45(a), is in our judgment, a question of law to be decided by the court. The conclusions of the Commission in this respect are not binding upon the court but are entitled to weight since they are reached by a body which is appointed to make a study of business and economic conditions and which is deemed to be especially competent to deal with matters committed to its charge. See Federal Trade Commission v. Gratz, 253 U.S. 421, 427, 40 S.Ct. 572, 64 L.Ed. 993; Federal Trade Commission v. R. F. Keppel & Bros., 291 U.S. 304, 314, 54 S.Ct. 423, 78 L.Ed. 814; Cf. Federal Trade Commission v. Motion Picture Adv. Co., 344 U.S. 392, 395, 396, 73 S.Ct. 361, 97 L.Ed. 426.

This view is supported by § 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009, which provides that except so far as the Statutes preclude judicial review or agency action is by law committed to agency discretion, all relevant questions of law shall be decided by the Court. Taking into consideration the original purpose of the regulation to hinder the entrance of new operators in the tobacco market and to severely restrict the operations of those who should gain entrance and considering, also, the probable effects of the enforcement of the Board's regulation, our conclusion is that the Commission was correct in finding that the regulation of the Board would constitute an unfair method of competition. See the interesting analysis of the conflicting decisions in respect to the scope of review by the Courts of the conclusions of the administrative agencies in Chapter 30 of Davis, Administrative Law Treatise.

We are advertent to the decisions of the Fifth Circuit in Rogers v. Douglas Tobacco Board of Trade, 5 Cir., 244 F.2d 471; and 5 Cir., 266 F.2d 636, where, in a case for damages under the Sherman Antitrust Act, the Court approved an allotment of selling time to a new warehouse calculated by dividing the selling time equally amongst a number of warehouses irrespective of size but expressed disapproval of a provision which restricted gain or loss to 3½% of the selling time for the preceding season. We note also the decision of the Supreme Court of North Carolina in Day v. Asheville Board of Trade, 242 N.C. 136, 87 S.E.2d 18, which held that Day, as a member of the Board, was bound by its regulation. The decisions of these Courts are of course entitled to respect, but we have reached a contrary conclusion upon additional evidence and upon the report of the Federal Trade Commission of which they did not have the benefit.

We do not regard the Commission's holding upon remand as at variance with our first decision. It is true that we indicated that the substitution of the performance system in place of the floor space system in the allotment of selling time was desirable as a means of preventing overbuilding and that, in making provision for a new warehouse, consideration should be given to a limitation upon gains or losses and also to the probability that free time would become available to a newcomer. But we did not express condemnation of what the Commission had done or undertake to prescribe the precise lines that the regulations should follow and we did expressly uphold the Commission in its holding that the 3½% gain or loss proviso was unreasonable and invalid. In short, our purpose was not to tie the hands of the Commission but to have it clear up the ambiguity above described and to give further consideration to the case in the light of our suggestions so that the interests of all parties would be conserved when the regulation was put in final form.

The Board also attacks the order of the Commission on the ground that it is vague and indefinite in that paragraph (1) merely requires that "reasonable credit" be given to the size and capacity of an entrant warehouse; and that paragraph (2) prohibits the use of the 3½% limitation of gain or loss of selling time or "any other unreasonably low percent-

age" and also prohibits any regulation which "in any other manner unreasonably limits the possible gain or loss in selling time allotted to any warehouse"; and that paragraph (3) prevents any warehouse doing business on the market from competing therein "on a fair and equal basis."

The Board contends that the quoted phrases are stated in such general terms that it is impossible to know in advance what the Commission or the Court may determine to be unreasonable or unfair and inequitable in these respects; and, hence, if this Court should affirm the order in its present form and command obedience to it under Section 45(c) of the Statute, the Board will be subjected to the risk of contempt proceedings in this Court and to a penalty of $5000 a day in civil proceedings under Section 45(*l*) of the Statute, if the Board should hereafter promulgate a regulation which may subsequently be found to be unreasonable or inequitable by the Court. It is insisted that the Board is entitled to know in advance the precise limits of permissible action.

Moreover, it is contended that if the Commission's order is approved in its present form it will, in effect, transfer to the Court an administrative responsibility which Congress has primarily entrusted to the Commission, because it may then become necessary for the Court, in contempt proceedings or in civil proceedings for the imposition of a penalty, to determine whether regulations proposed by the Board are in fact reasonable and proper.

This view is supported by the decision of the Supreme Court in Federal Trade Commission v. Morton Salt Company, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196, where a cease and desist order of the Commission had prohibited a manufacturer of salt from discrimination in price between purchasers of its product but had permitted 5 cents per case differentials which do not tend to lessen, injure or destroy competition. The Court rejected the qualification because it was cast in general terms and tended to shift to the

Court the responsibility and authority of the Commission. Accordingly, the case was sent back to the Commission to refashion the terms of its order. See also Milk & Ice Cream Can Institute v. Federal Trade Commission, 7 Cir., 152 F.2d 478.

■ We think that the point is well taken. It is true that the Commission, in carrying out its function to prevent illegal trade practices, is not limited to prohibiting an illegal practice in the form which has been found to exist in the past.

In Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081, the Court said:

> "If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity. Moreover, '(t)he Commission has wide discretion in its choice of a remedy deemed adequate to cope with the unlawful practices' disclosed. Jacob Siegel Co. v. Federal Trade Comm., 1946, 327 U.S. 608, 611, 66 S.Ct. 758, 759, 90 L.Ed. 888. Congress placed the primary responsibility for fashioning such orders upon the Commission, and Congress expected the Commission to exercise a special competence in formulating remedies to deal with problems in the general sphere of competitive practices. Therefore we have said that 'the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.' "

■ The orders of the Commission, however, must be sufficiently specific so that the trader may be definitely informed as to the extent of the prohibited area and the Courts, in subsequent proceedings, may limit their inquiry as to whether the precise prohibitions of the Commission's order have been violated.

In the pending case the Commission was justified in its apprehension that the Board intended to minimize competition in the sales of tobacco in the Asheville market as far as possible, and in ordering the Board to cease and desist its existing illegal practices. The Commission was also justified in warning the Board that no other unreasonable restrictions upon competition would be tolerated; but such a warning, however appropriate in the Commission's opinion, should not have been inserted in the order. It seems that the Commission did not intend or expect its order to be the final step in the proceeding, since it directed the Board to report within 60 days the manner in which it had complied with the Commission's order. This procedure gives the Board the opportunity for further conference with the Commission's staff in arriving at the terms of a workable order, if the Board's proposal should be deemed improper, and also gives the Commission an opportunity to issue a further cease and desist order if the Board insists upon a plan which the Commission deems to be improper. In such event the Board will have a further right of review of the proceeding by this Court if it so desires.

We, therefore, approve the cease and desist order of the Commission with the exception that the three numbered paragraphs shall be modified so that the respondents are ordered to cease and desist from any plan which:

1. Allots selling time to new entrant warehouses on the Asheville tobacco market on any basis or in any manner which refuses to give any credit to the size and capacity of a new entrant in excess of the average size and capacity of all the warehouses in the market;

2. Limits the possible gain or loss in selling time allotted to any warehouse for any one selling season to $3\frac{1}{2}\%$, of the selling time allotted to such warehouse for the preceding selling season; or

3. Has the purpose or effect of foreclosing or preventing a new entrant warehouse on the Asheville tobacco market, or any other warehouse doing business on that market, from competing therein.

The order in this form prohibits only the present specific practices of the Board; but it should be noted that the Commission has appropriately warned the Board that no other unreasonable restrictions upon competition will be tolerated. Consequently, the Board's present regulations for the allocation of selling time having been disapproved, it is now incumbent upon it, if it wishes to promulgate any other regulations, to meet with the Commission's staff and to propose, for the Commission's determination, limitations which place only reasonable restrictions upon competition in the Asheville tobacco market.

The order of the Commission, as modified in the manner described, is affirmed and the case is remanded to the Commission for further proceedings consistent with this opinion.