C. T. DAY, Plaintiff,

v.

James E. WALKER, Jr., Individually, and as President, Director and Member of the Asheville Tobacco Board of Trade, Inc.; J. Carlie Adams, Luther G. Hill, and James W. Stewart, Individually and as Directors and Members of the Asheville Tobacco Board of Trade, Inc.; Walter Walker, Individually and as a Member of the Asheville Tobacco Board of Trade, Inc.; Max M. Roberts, Individually; Asheville Tobacco Board of Trade, Inc., a Corporation; and Farmers Federation Cooperative, Inc., a Corporation, Defendants.

Civ. No. 2037.

United States District Court
W. D. North Carolina,
Asheville Division.

June 12, 1962.

Ward & Bennett, William C. Moore, Asheville, N. C., for plaintiff.

Howrey, Simon, Baker & Murchison, Washington, D. C., Elmore & Martin, Joseph C. Reynolds, Asheville, N. C., for defendants.

WARLICK, Chief Judge.

This is a civil action brought by the plaintiff under the Clayton Act, 15 U.S. C.A. § 15, to recover treble damages allegedly sustained by him as a result of an alleged conspiracy on the part of the defendants in violation of section 1 of the Sherman Act, 15 U.S.C.A. § 1.

The defendants filed timely motions to dismiss the action on the grounds (1) that the plaintiff had failed to state a claim upon which relief could be granted, and (2) that the plaintiff's cause of action was barred by the four year statute of limitations set forth in 15 U.S.C.A. § 15b.

Hearings were had on these motions in Asheville on April 23, 1962, and the motion directed towards the sufficiency of the complaint to state a cause of action was overruled. The question of the statute of limitations was taken under advisement by the Court. The statute in question provides:

"Any action to enforce any cause of action under Sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued."

It is well settled that the defense of limitations may properly be raised by a motion to dismiss when the complaint shows on its face that the action was not brought within the statutory period. Suckow Borax Mines Consolidated, et al. v. Borax Consolidated, Limited, et al., 185 F.2d 196, (9th Cir., 1950); Barron & Holtzoff, Federal Practice and Procedure, § 281 and 349.

The defendant, Asheville Tobacco Board of Trade (herein referred to as the "Board") is a non-stock corporation organized under the laws of North Carolina. The individual defendants and the Farmers Federation Cooperative are members of that Board. Membership is open to warehousemen and purchasers of leaf tobacco, but only warehousemen or their general managers are eligible for membership on the Board of Directors, which is the governing body of the Board.

By common consent, the Burley Tobacco Association, a voluntary interstate organization, assigns selling time to the several Burley Tobacco Markets. The auction season at Asheville begins around December 1, and lasts about six weeks. Within the Asheville market, a rotation system is used, each warehouse receiving its allotted percentage of selling time each day. If a warehouse does not have enough tobacco on its floor to consume all of its allotted time "free time" results and passes on until the sale reaches a warehouse which has enough tobacco on hand to use the free time on that day. If a warehouse has more tobacco on hand than the allotted time or free time, then

that warehouse is said to be "blocked". The initial allocation of selling time and the granting of free time is made for the Asheville market by the Sales Supervisor, an employee of the Board.

In 1953, the Asheville Market had eleven warehouses, with a total of 475,-182 square feet of floor space. During the 1953 season and for several years prior thereto, the Board, as agreed to by all members, had allotted selling time to each warehouse on "the floor space system", i. e., the percentage of selling time allotted to each warehouse was in direct proportion to its floor space.

In January, 1954, Day, an independent buyer of tobacco, who had been a member of the Board for many years, announced his intention to build a warehouse containing 125,000 square feet of floor space. Thereafter, the plaintiff alleges, the defendants conspired and agreed to restrain and suppress fair and open competition by the plaintiff in his conduct of a tobacco auction warehouse on the Asheville Market. This was sought, he alleges, by the following overt acts.

On January 14, 1954, the Board adopted a regulation which would give new warehouses, during their first year, selling time based on 50% of their total floor space. This was to increase to 75% for the second year, and to 100% for the third and subsequent years. This plan was never put into effect.

On October 2, 1954, the Board adopted new by-laws which (1) discarded the floor space system, (2) adopted a modified "performance system" for the allotment of selling time to existing warehouses, and (3) set up a "unit" system for the allocation of selling time upon the entry of a new warehouse.

Normally, under a pure performance or historical system, selling time is allocated to each warehouse in direct proportion to the producer's sales in such warehouse during the year preceding the allotment. The Board, however, modified this system by "a gain or loss proviso" which provided that the selling time allotted to any warehouse shall not vary more than

3½% from the selling time allotted to such warehouse for the preceding season. The "new warehouse proviso" adopted, allotted to a new warehouse a unit of selling time equal to the average of the selling times of all warehouses on the market, unless such new warehouse was smaller than the average, in which event its allotment was reduced accordingly.

Since the plaintiff's new warehouse raised to twelve the number in Asheville, it was allotted 8.33% or one-twelfth of the total time available, although it contained 20.83% of the total selling space for the 1954 season. The plaintiff states that he was relying on the floor space system when he built his warehouse, and if he had known that the Board was going to change the method of allocation, he would not have built his warehouse. In addition to the adoption of new regulations regarding allocation of sales time, the plaintiff further alleges that during the selling season of 1954, the Board, and the individual defendants caused the Sales Supervisor to refuse to give the plaintiff's warehouse "extra sales time" when he was so entitled, thus causing his warehouse to be "blocked" several times during that season.

Immediately after the allocation of selling time in 1954, Day filed suit in the Superior Court of Buncombe County, asking for an injunction against enforcement of the new regulations. In November, 1954, the Court denied the injunction after conducting a hearing and making findings of fact. Day appealed to the Supreme Court of North Carolina, which affirmed the judgment of the Superior Court, thereby holding the regulations fair and equitable, and not in restraint of trade. Day v. Asheville Tobacco Board of Trade, Inc., 242 N.C. 136, 87 S.E.2d 18.

During the 1954 selling season, despite the fact that his warehouse was blocked more often and for longer periods than any other warehouse, Day succeeded in selling 20.19% of all producers' tobacco sold on the Asheville Market. This came about as a result of free time accruing to him on days when the other ware-

houses had sold all the tobacco they had on hand before the allotted time expired. The gain or loss proviso adopted in October, 1954, however, limited any possible increase in the plaintiff's 1955 allotment to 3½% of the 8.33% allotted to him in 1955, so his allotment for the season of 1955 was only 8.64% of the total selling time. As in 1954, Day again alleges that he was denied extra sales time by the sales supervisor during the 1955 season and that this was brought about by the defendants in furtherance of their conspiracy to drive him out of business.

In 1956, Day lodged a complaint with the Federal Trade Commission. The hearing examiner found that the acts of the defendants were an unreasonable restraint of trade, and constituted unfair methods of competition and unfair acts and practices in commerce within the intent and meaning of section 5 of the Federal Trade Commission Act (15 U.S.C.A. § 45). The Commission adopted this decision and issued its cease and desist order. This order was appealed to the United States Court of Appeals for the Fourth Circuit, which Court remanded the cause to the Commission for further proceedings. Asheville Tobacco Board of Trade, et al. v. Federal Trade Commission, 263 F.2d 502, 4th Cir. 1959.

In the Fall of 1956, Day alleges that the Board, in furtherance of the conspiracy, assessed him, as a member, $657.96 for the purpose of defraying attorney's fees and expenses incurred by the Board in defending the proceeding brought by the Federal Trade Commission. He further says that the Board threatened him with suspension of his right to operate a tobacco auction warehouse during the 1956 season unless he paid the assessment. He alleges he paid the amount under protest in order to continue to do business.

For the selling season of 1956, Day was allotted 8.33% of the total selling time, plus an additional 3½% based on his 1955 performance. He sold 21.4% of the total tonnage in 1955, but the 3½% gain proviso prevented him from getting full credit for it during the 1956 season. Again, Day alleges, he was denied extra sales time by the sales supervisor.

During the 1956 season, Day sold over 27% of the total tonnage for the Asheville Market, but was only allotted 10.33% of the total sales time, plus an additional 3½% for the 1957 season. Again in 1957, he alleges a denial of extra sales time, and another illegal assessment for attorney's fees in the amount of $1,000.

In 1958, Day alleges he was only allotted 8.33% of the total selling time plus an additional 3½% and was again denied extra selling time. The assessment for attorney's fees was again made on him and this time in the amount of $1,500.

In 1959, he again alleges that the allotment was only 8.33% plus an additional 3½% selling time, and that he was again denied extra sales times. The assessment for that year was $1,500.

During the 1960 season, Day again alleges he was denied extra sales time and illegally assessed $1,800 for attorney's fees. The last overt act alleged is an assessment for $2,100 made in 1961 for attorney's fees.

On October 18, 1960, after hearing additional testimony, the Federal Trade Commission issued an opinion and modified order wherein it ordered the Board to cease and desist from adopting any plan which:

"1. Allots selling time to new entrant warehouses on the Asheville tobacco market on any basis or in any manner which fails to take into account and give reasonable credit for the size and capacity of a new entrant;

"2. Limits the possible gain or loss in selling time allotted to any warehouse for any one selling season to 3½%, or any other unreasonably low percentage, of the selling time allotted to such warehouse for the preceding selling season, or in any other manner unreasonably limits the possible gain or loss in selling time allotted to any warehouse;

"3. Has the purpose or effect of foreclosing or preventing any new entrant warehouse on the Asheville tobacco market, or any other warehouse doing business on that market, from competing therein on a fair and equal basis."

The Federal Trade Commission also ordered the Board to file with the Commission a report in writing within sixty days setting forth in detail the manner and form in which they had complied with the order. On appeal, the Court of Appeals modified the order of the Commission, ordering the Board to cease and desist from any plan which:

"1. Allots selling time to new entrant warehouses on the Asheville Tobacco Market on any basis or in any manner which refuses to give any credit to the size and capacity of a new entrant in excess of the average size and capacity of all the warehouses in the market;

"2. Limits the possible gain or loss of selling time allotted to any warehouse for any one selling season to 3½% of the selling time allotted to such warehouse for the preceding selling season, or

"3. Has the purpose or effect of foreclosing or preventing a new entrant warehouse on the Asheville Tobacco Market, or any other warehouse doing business on that market, from competing therein."

The case was affirmed as modified and remanded so that the Board might meet with the Commission staff and propose limitations which place only a reasonable restriction on the Asheville Market. Asheville Tobacco Board of Trade v. Federal Trade Commission, 294 F.2d 619, 4th Cir. 1961.

Thus it is the contention of the plaintiff that but for the alleged conspiracy and the acts committed by the defendants in furtherance of that conspiracy, he would have realized profits of $250,000 since the year 1954, and further that because he was forced to pay illegal assessments for attorney's fees he has been damaged $6,457.96. He prays for treble damages in the amount of $769,379.88.

It is the contention of the defendants that the entire action is barred by the four year statute of limitations, and they move for a dismissal. The plaintiff's cause of action, they argue, arose on October 2, 1954, when the Board adopted the new regulations. It was at this moment his injury occurred, and this fact must have been known to Day, for he brought an action in the State court to enjoin the enforcement of the regulations. The yearly allocation of sales time, the defendants say, was merely a ministerial function, applying the regulations of 1954, and was not new causes of action, but only items of damage flowing from the regulations as originally adopted.

The defendants rely rather strenuously on the case of Muskin Shoe Co. v. United Shoe Machinery Corp., 167 F.Supp. 106, D.C.Md.1958. There, Muskin had leased shoe machinery from United under various leases and had made periodic payments pursuant thereto. United had been found guilty of violating section 2 of the Sherman Act in an action brought by the United States. Muskin then brought an action for treble damages for all the payments it had made pursuant to such leases during the four years preceding the filing of the action. The leases had been executed more than four years prior to commencement of the action. There the court held the cause of action arose when the leases were executed, and was barred by the statute. The payments, the court rules, were merely items of damage flowing from the execution of the leases. The defendants in the instant case argue that this case presents the same situation and the law of the Muskin case is applicable here.

In addition, the defendants rely on the cases of Emich Motors Corp. v. General Motors Corp., 7 Cir., 229 F.2d 714, 59 A.L.R.2d 159, and Momand v. Universal Film Exchanges, 1 Cir., 172 F.2d 37, for

the proposition that the statute of limitations begins to run on the date which the plaintiff first has the right to bring action for such injury, not as each item of damage resulting from such injury is sustained.

While these principles cited by the defendants may be well taken, they have little, if any bearing on this case. The Muskin case, supra, and the Emich Motors Case, supra, are not conspiracy cases and are not applicable to the facts at hand. The other authorities relied on by the defendants can similarly be distinguished on their facts as not being applicable.

On the other hand, the plaintiff contends that there existed a conspiracy on the part of the defendants to restrain free competition, and that this conspiracy was furthered by the 1954 regulations, the allocation of sales time each selling season, the denial of extra sales time each year, and the illegal assessments placed on his membership from 1956 until 1960. The plaintiff relies on the rule that in a continuing conspiracy the statute of limitations does not commence to run until the last overt act, performed in compliance with the original agreement, has been accomplished. In support of this the plaintiff cites Northern Kentucky Tel. Co. v. Southern Bell Tel. & Tel. Co., 6 Cir., 73 F.2d 333, 97 A.L.R. 133; Steiner v. 20th Century Fox Film Corp., 9 Cir., 232 F.2d 190 and other authorities as they appear in 62 A.L.R.2d 1369.

While there appears to be ample authority to support the contention of the plaintiff, there is also another line of cases not relied upon by either party which seem to bear on the subject at hand. In several decisions the courts have put forth the general rule that in a civil anti-trust conspiracy case, the four year statute of limitations begins to run from each overt act causing damage to the plaintiff. Park-In Theatres, Inc. v. Paramount-Richards Theatres, Inc., 3 Cir., 90 F.Supp. 727, affirmed 185 F.2d 407; Momand v. Universal Film Exchanges Inc., supra; Crumner Co. v. Du-Pont, 6 Cir., 223 F.2d 238; 62 A.L.R.2d 1369, and cases there cited.

These cases proceed on the assumption that each overt act in furtherance of the conspiracy creates a distinct cause of action in so far as are concerned the damages attributable to that act. Thus, limitations with respect to the damages attributable to each separate act in furtherance of the conspiracy begin to run at the time each act is committed. The result of this rule is that the damages attributable to those acts which occur earlier than four years prior to the bringing of the action cannot be recovered, while those damages attributable to those acts occurring within such period can.

In any event, the motion of the defendants is directed to the complaint. For the purpose of the motion, the allegations are deemed to be true, and the plaintiff alleges a conspiracy on the part of the defendants. While the argument of the defendants that there is but one cause of action i. e. the regulations passed in 1954, could be true, this must wait the presentation of evidence at the trial before it can be determined. In this sense, it would appear that the motion of the defendants is premature and accordingly is denied. At the trial, should the conspiracy be established, then either rule regarding conspiracies as mentioned before would be applicable as the Court should determine. Should the plaintiff fail to establish a conspiracy, then the question of the statute of limitations would become moot and unnecessary to decide.

There is in addition, a question of the suspension of the statute of limitations pursuant to 15 U.S.C.A. § 16(b) (i. e. during the Federal Trade Commission proceedings from 1956 to 1960). Due to the above reasoning regarding the questions of limitations, it is felt that this issue need not be discussed at this time.

Finally, in addition to the motions to dismiss, the defendants have also made various motions to strike certain allegations from the complaint. These motions

have not been argued by counsel as of this time, most likely awaiting the outcome of this decision on the statute of limitations. If a further determination is desired a hearing can accordingly be had.

Motion denied.