372 F.2d 634
 The DANVILLE TOBACCO ASSOCIATION, a corporation; Producers Tobacco Company, Incorporated; W. Townes Lea and Louis W. Love, partners, trading as Piedmont Warehouse and Hughes Warehouse; Neals Warehouses, Inc., Jack L. Neal and George A. Myers, Jr., T/A Growers Warehouse, and Latane Motley and Blair Motley, Jr., and John W. Motley, Executors of the Estate of Blair Motley, Deceased, T/A Motley's Warehouse, and Danville Warehouse Company, Incorporated, Appellees,
v.
BRYANT-BUCKNER ASSOCIATES, INC., Appellant.
 No. 10579.
 United States Court of Appeals Fourth Circuit.
 Argued October 31, 1966.
 Decided January 25, 1967.
 
 I. Murchison Biggs, Lumberton, N. C. (Robert F. Ward, Chatham, Va., on brief), for appellant.
 Edwin B. Meade, Danville, Va. (Meade, Tate & Meade, Danville, Va., on brief), for appellees The Danville Tobacco Ass'n and Danville Warehouse Co., Incorporated.
 C. Stuart Wheatley, Danville, Va. (John W. Carter, Clement, Wheatley, Winston & Craig, and Carter & Carter, Danville, Va., on brief), for appellees W. Townes Lea et al.
 John W. Carter, Danville, Va. (C. Stuart Wheatley, Clement, Wheatley, Winston & Craig, and Carter & Carter, Danville, Va., on brief), for appellees Neals Warehouses, Inc., et al.
 G. Kenneth Miller, Richmond, Va. (Allan Garrett, Earle Garrett, III, Garrett, Garrett & Smith, Danville, Va., and May, Garrett, Miller, Newman & Compton, Richmond, Va., on brief), for appellees Producers Tobacco Co., Incorporated.
 Before BRYAN, BELL and WINTER, Circuit Judges.
 ALBERT V. BRYAN, Circuit Judge:
 
 
 1
 Apportionment of selling time among the warehousemen on the Danville, Virginia tobacco market, comes here again as an alleged affront to the Sherman Antitrust Act.[1] It is a second appeal in the original suit with which we dealt in Danville Tobacco Association v. Bryant-Buckner Associates, Inc., 4 Cir., 333 F. 2d 202 (1964).
 
 
 2
 In accordance with our suggestion on remand, the District Court asked the Federal Trade Commission to advise it upon the validity of an apportionment system known as the "permanent plan" and approved by the District Court for use beginning with the 1963 season, or to prescribe an appropriate scheme if the permanent plan were found objectionable. In our opinion in 1964 we approved, as a transitory measure, an interim plan approved by the District Court for 1962 which gave defendant-warehouseman Bryant-Buckner Associates (B-B) a diminished selling-time as a new entrant (in 1962) into the market. This interim plan was incorporated into the permanent plan, which we permitted to operate pro tempore pending the report of the Commission. In its response, the Commission found the permanent plan less than "reasonable, fair and equitable", and devised a wholly new formula.
 
 
 3
 However, the District Court rejected the Commission's scheme and declared the permanent plan to "constitute a proper and legal manner of allocating selling time both as to the warehousemen now on the Danville market and as to a new entrant". B-B now appeals from this ruling. We affirm.
 
 
 4
 The knot of this controversy is the validity of the constriction placed upon the share allotable to a new warehouseman in the total daily selling time of the market. These restraints were written into the regulations of the Danville Tobacco Association, a membership, nonprofit corporation created by the Virginia legislature "for the purpose of * * * regulating the sale of leaf tobacco and trade" in Danville. All of the company buyers and warehousemen, including B-B, are members. The "selling time" of a warehouse is its portion of the total tobacco — here 8800 baskets — that may be sold each day on the market. The rules of the Bright Belt Warehouse Association[2] and the Danville Tobacco Association stipulate that the daily sale period cannot exceed 5½ hours, and must proceed at a rate of not more than 400 baskets per hour for each of four buying teams.
 
 
 5
 This suit was commenced by the Association immediately after the admission of B-B to membership in February 1962. Naming all warehouse members as defendants, it sought a declaratory judgment upon the legality under the antitrust laws of an initial plan, and when it was condemned, the permanent plan was submitted by the Association for a like ruling. Danville Tobacco Assoc. v. Bryant-Buckner Associates, Inc., supra, 333 F.2d 202, 209.
 
 
 6
 The permanent plan purports, in brief, to allocate selling time on the basis of the proportion of the floor space in each warehouse to the total floor space on the market. Any member is entitled to increase its allotment upon showing that its sales for the previous year exceeded its allotment. A gain or loss, however, cannot go beyond 8% of a preceding year's allotment. In addition, special limitations are placed upon new entrants, that is those joining after 1962.
 
 
 7
 In the District Court's decree now on review, the permanent plan is set forth in full, the now-pertinent parts of it reading:
 
 
 8
 "8. The Modified Experience System and Adjustments To Be Made as a Result of Fair Competition
 
 
 9
 "1. A warehouse unit on and in the Danville Market is identified as a building which is suitable in every respect for selling leaf tobacco at auction in an efficient manner, and which is available therefor, and which is in compliance with the requirements of the Danville Tobacco Association Rules and Regulations relating to the construction and maintenance of tobacco sales warehouses. Provided that the requirement as to `available therefor' shall be satisfied if it is determined, on the day when the allocation of selling time is made for an approaching season, that the warehouse is available for that season; and provided, further, that the requirements as to `available' shall not apply to any warehouse which, on September 10, 1962, was under an uncancellable lease, until said lease shall have expired. Each warehouse area measuring 87,500 square feet shall be considered a unit and any proportionate part thereof shall be considered that percentage of a unit. At the time of the opening of the 1962 Danville Market there were on the market 21 such units. (This includes three units for Bryant-Buckner * * *.)
 
 
 10
 "2. Original selling time is that which existed for each tobacco warehouse on the opening date of the 1962 Danville Market.
 
 
 11
 "3. Selling time for the 1963 season shall be the same as that for the 1962 season, subject only to such adjustments as may become necessary by reason of the admission of new warehouses, additions to existing warehouses, withdrawals, transfers, leases and mergers, as hereafter provided in these rules and regulations. Beginning with the year 1963 adjustments of selling time for competitive gains or losses shall be made at the end of the 1963 season so as to reflect the valid and credible experience of each warehouse to which selling time was allocated in 1963, such adjustment to be made on the basis of producers sales in pounds plus bona fide resales. * * * No warehouse shall gain or lose, at the end of the season, more than 8% of the selling time which it had during that season. * * * Similar adjustments shall be made at the end of each season thereafter.
 
 
 12
 * * * * *
 
 
 13
 "8B. The Admission of New Warehouses and Additions to Existing Warehouses
 
 
 14
 "1. A `new unit' is a warehouse constructed after the market opening of 1962, containing 87,500 square feet of floor space available and suitable for warehouse operations as defined above, whose owners and operators shall be independent of the ownership and operations of any other warehouse facilities on the Danville Market. * * *
 
 
 15
 "2. An `added unit' is warehouse space of 87,500 square feet suitable and available for warehouse operations in Danville, either an addition to an existing warehouse or a new structure, which does not qualify as a `new unit' as defined above.
 
 
 16
 "3. `New units' and `added units' and fractional parts thereof entering the Danville Market in 1963 shall receive allocation of selling time as follows:
 
 
 17
 "3a. Prior to the second Tuesday in March, 1963, there shall be computed the number of `new units' of 87,500 square feet and the number of `added units' of 87,500 square feet (provided that new construction or added construction of less than 87,500 square feet shall be treated as a fractional unit), and to the sum of those units there shall be added the number of units remaining from the 1962 season. The total available selling time shall then be divided by the total number of units. The result is a `unit selling time.'
 
 
 18
 "3b. To each `new unit' there shall be allocated, for the 1963 season, selling time equal to 75% of the unit selling time.
 
 
 19
 "3c. As `added units' are built, either new buildings, additional floor space in new units, or additions to existing buildings, the computation of additional selling time for such `added units' shall be made after giving full consideration to the units of floor space to which the `added units' attach, or with which they unite in common ownership or operation * * *, and the computation of additional selling time for such `added units' shall be made as follows:
 
 
 20
 "(1) For 87,500 square feet of available warehouse space added to a new or to an existing unit of 87,500 square feet, there shall be allocated 50% of a unit selling time.
 
 
 21
 "(2) For each 87,500 square feet of warehouse floor space added to 175,000 square feet or more of warehouse floor space under common ownership or management * * *, there shall be allocated 25% of a unit selling time.
 
 
 22
 "4. For each year following the year 1963, the allocation of selling time to new and added units and the handling of withdrawn units shall follow the rules above prescribed for such handling in the 1963 season.
 
 
 23
 "5. Whenever it becomes necessary to provide selling time (as reflected by baskets) to a new or an added unit, such selling time shall be taken from existing warehouses in proportion to their selling time."[3]
 
 
 24
 In the effectuation of this pattern a newcomer is first assigned its share under the plan, and the remaining selling time is then distributed among the older warehouses pro rata — in the proportion of the prior year's holding of each of them.
 
 
 25
 For its own plan the Commission used 87,500 square feet — the average size of the warehouses — as a space-unit measurement for the allocations and 8% as the gain or loss limitation. However, it thought the restriction of a new member to less selling time per space-unit than that allowed the older warehouses was inimical to the antitrust statutes, as constituting an unlawful restraint upon an outsider.
 
 
 26
 The plan put forward by the Commission placed a new warehouse upon an equality with the older warehouses in the allocation of selling-time. It would grant each warehouse, new and old alike, one credit-unit (a selling-time unit) for the first 87,500 square feet of floor space. For the next 87,500, each would receive a credit of 75% of a unit. For the third 87,500 a credit of 50% would be given, and for a fourth a credit of 25%. The total available baskets — 8800 — would then be apportioned among the warehouses in the proportion that the total credit-units of each warehouse bore to the aggregate of such units on the market.
 
 
 27
 I. Before considering the District Court's discard of the Commission's plan, we turn to B-B's attack upon the Court's final approval of the permanent plan as embodying a fair and reasonable pattern for allotment of selling time to a new entrant. Throughout this discussion it must be recalled that B-B's allotment was initially fixed by the interim plan employed for 1962, and that it was taken into the permanent plan as it became effective in 1963.
 
 
 28
 Because of this origin, B-B's allocation was never subjected to the 75% reduction on its initial 87,500 as required by the permanent plan. B-B was accorded much more. In its application for membership in February 1962 B-B first stated it would build 420,000 square feet, then it said 500,000, and then 268,792, of storage space. Actually it built 168,000. Nevertheless, in the interim plan, and ever since, the Association has allowed it selling-units for 268,792. The first unit of 87,529 square feet[4] received full credit. To the remainder of the 268,792, the declining gradations of selling-units were applied, that is 50% to the second 87,529 and 25% to the balance. Although, obviously, there was no balance, B-B was still allowed credit for it.
 
 
 29
 The baskets allocable per space-unit on the market were 419, and on the Association's reckoning, B-B received 724 baskets. If its warehouse had been allowed 100% on each space-unit, as B-B now asks, it would have received, it avers, about 851 baskets — its reduction, thus, was 127 baskets or 15% below the norm of the established warehouses.[5] This decrease we found on the first appeal had not been proved to be an unfair restraint. Danville Tobacco Assoc. v. Bryant-Buckner Associates, Inc., supra, 333 F.2d 202, 206, 208. The reasons for this holding are more fully expounded later herein, and on those grounds we adhere to our prior conclusion.
 
 
 30
 All assignments made in 1962, including B-B's and after distribution of the remaining time among the other warehouses, have since been continued in force pending a final adjudication upon the permanent plan. Thus it incorporates the 1962 allocations as a starting point. Actually, then, B-B has not so far been injured by the reductions stipulated in the permanent plan. On the other hand, it has been made eligible for the 8% gain-or-loss limitation of the permanent plan, not an original attribute of the interim plan.
 
 
 31
 B-B's apprehension as to the permanent plan appears to be premature and presently academic. However, as a member, B-B may have a right to contest the District Court's declaratory judgment upholding the permanent plan as a regulation of the Association enforceable upon future applicants. For this reason and to avoid any chance of incompleteness in our adjudication, as well as for comparison of the prevailing plan with the F.T.C.'s suggested plan, we undertake a discussion of the permanent plan.
 
 
 32
 Prior to and during World War Second, there was no surplus of storage space, and selling opportunities were shared by the warehouses by agreement or by employment of the floor-space method. After the war as building materials became accessible, the possibility of wasteful erection of additional warehouses created a problem in distributing selling time. The floor-space system was then in vogue at Danville and continued undisturbed until B-B in 1962 sought to enter the market with an extensive warehouse.
 
 
 33
 Restrictions on the selling time of newcomers in a tobacco market of the kind applied to B-B in 1962 and provided in the permanent plan are not necessarily unlawful abatements. The evidence demonstrates that the confinement of a latecomer to less-than-average selling-units is necessary in order to maintain the integrity of the market, an institution quite generally recognized as an essential in the production and sale of tobacco. Asheville Tobacco Board of Trade, Inc. v. F.T.C., 263 F.2d 502, 505 (4 Cir. 1959) reheard 294 F.2d 619 (4 Cir. 1961). It is for this reason that the courts have sustained the power of a board of trade, such as the Association here, to regulate the disposal of selling time. Indeed, the vendition is held affected with a public interest and the Association is in some aspects almost a State agency. Cf. Asheville Tobacco Board of Trade, Inc. v. F.T.C., supra, 263 F.2d 502, 507, 509.
 
 
 34
 Incidentally, because the quantity of tobacco salable each day has a fixed and constant maximum, its disposition presents an economic situation unfamiliar to those dealing in commodities less limited in supply. For this reason, auction under regulations has been considered the fairest means of sale for the producers, the buyers (the companies who furnish the teams of bidders) and the public. Cf. Rogers v. Douglas Tobacco Board of Trade, 244 F.2d 471, 476 (5 Cir. 1957).
 
 
 35
 Without some circumscription upon the appearance of new, and the enlargement of existing warehouses, competition could be destroyed, and the market monopolized, contrary to antitrust policy by the warehouseman who was able to outbuild the others. Furthermore, unrestrained multiplication or expansion could so water down the business as to render it unprofitable and the market useless to the public. Even threats to overbuild could become an item of trade. Healthy discouragement of surplus building, it has been found, may be achieved to a degree by fairly withholding full participation in the market from a stranger until he proves he is not gambling.
 
 
 36
 Any such association, therefore, has to endeavor to find the delicate balance between building-control and unfair restraint of competition. To assist in preventing the latter abuse, a gain-or-loss provision is frequently included, as in the permanent plan, in the regulations. It permits a new competitor to increase its selling time from year to year. At the same time it safeguards a warehouseman against an unjust loss of standing as the result of crop failures and like infelicitous contingencies. Naturally, this factor has frequently been in litigation, on the charge of unduly impeding a new arrival's attaining an equality with his precedessors. Nevertheless it has been upheld when it is seen to be reasonable in the circumstances. See Rogers v. Douglas Tobacco Board of Trade, 266 F.2d 636 (5 Cir. 1959); Asheville Tobacco Board of Trade, Inc. v. F.T.C., supra, 263 F.2d 502, 510-11, and as reheard 294 F.2d 619, 625.
 
 
 37
 Instantly, the 8% gain-or-loss rate, while not expressly approved for use in the permanent plan, is not disfavored by the Commission if the initial allocation is not unreasonable. The percentage has been found by the master and the District Court to permit a fair augmentation of selling time. Likewise, neither finds unreasonableness in the 25% reduction of credit-units given a new entrant. In this, of course, the judge impliedly approves the 15% reduction of B-B under the terms of its 1962 admission to the Association. These ascertainments we cannot say are faulty.
 
 
 38
 II. B-B's foremost protestation, evidently, is the District Judge's refusal to replace the Danville system with the Commission's. The latter would give B-B, whether or not a new entrant, 975.85 baskets — an increase of 251 above its quota of 724 — while decreasing by 251 the share of the oldest warehouse at Danville. We see no error in the Court's action.
 
 
 39
 To start with, the Commission's plan does not discourage superfluous buildings. Rather it invites new structures of first-unit size, because floorage of that quantity would receive an undiminished allotment equivalent to the first stage of each of the existing warehouses. Again, there is no absolute legal right in a new entrant to have a prevailing system remolded or discarded for a new model. The duty of a board of trade is to avoid or alleviate unfair restraint sufferable by a new or added warehouse. If this concern is relieved, then there is no just grievance. Presently, this aim has been achieved without a wholesale reshuffling or new dealing of the selling time.
 
 
 40
 The plan advanced by the Commission seems logical and acceptable enough for a market just opening, but caution should be used in uprooting an established and working system and recasting it in another form, especially one which goes beyond the limits of this controversy. Attempt at a wrenching reformation was thought by the District Court to be particularly and unwarrantably disruptive at Danville. During the years, the warehouses there have made adjustments in the distribution of selling time to absorb any floorage demand as it arose. They did so, to repeat, as late as 1962 to accommodate the entry of B-B. To inaugurate another system would mean the dissolution of reconcilements which have been found necessary and practicable from year to year. Sweeping innovations, unless indispensable, could force the parties to revive old irritations. Doubtlessly, too, myriad unforeseeable contentions could develop. A general rearrangement could also penalize warehousemen who had not contributed to overbuilding. These conclusions of the District Judge cannot be cast aside lightly, for there is wisdom in them.
 
 
 41
 In this consideration, it must be remembered that the Danville warehouse situation of today is the eventuation of an historical progression. It was not conceived deliberately or at one time; nor was it structured to exclude newcomers. It "just grew" into its present shape and state. The conception of a new start puts theory above actuality. With the District Judge, we think it too speculative in success to be posted as the antitrust standard the Association must meet. Nor is it the province of a Federal court to divine and adjudicate hypotheses.
 
 
 42
 III. Unreasonable restraint of trade is also charged by B-B because, in assigning selling time figured on floorage, the computer counted space in the older warehouses which was not used for the sale of tobacco. The factual premise is indisputably true. The area required per basket is variously estimated from 20 to 40 sq. ft. Even at 50 sq. ft., only about 440,000 would be needed for the entire 8800-basket quota. In contrast, there are now more than 1,700,000 sq. ft.
 
 
 43
 Although this enormous excess is not utilized in the vendue of tobacco, it is needed to some extent for storage pending sale or resale. Concededly, some of the area is let out for purposes foreign to tobacco sales. Nevertheless, as the regulations of the Association already quoted will confirm, no floorage credit is given to any part of a warehouse which is not in truth readied or readiable for the sale of tobacco during the season.
 
 
 44
 B-B can hardly be heard to complain on the score of superfluous space, for it stands in pari delicto in the vice. Its allotment, apparently less than 800 baskets, could well be taken care of within 40,000 sq. ft., yet it has a warehouse of more than 168,000 sq. ft. and, to repeat, was granted selling time on a floorage of more than 268,000.
 
 
 45
 The Commission decried the superfluity of space generally, and recommendee that it be remedied by Association regulations. In outlining its plan, the Commission used all the space now on the market. Although this is not to be taken as its approval, it does show that the Commission recognized that the problem must be resolved practically and within the facts of the Danville market. The Commission said:
 
 
 46
 "It is our opinion therefore that, as a general proposition, any proper standard for the control of surplus space, i. e., selling time, on these markets should envision equality of treatment among all members of the market, present and future under whatever system each respective board of trade elects to adopt. Each such system moreover should countenance only the use of space which is in fact `suitable and available'. This can best be dealt with by way of appropriate definition in the by-laws or other appropriate media."
 
 
 47
 This view prevailed, too, in the District Court. The present regulations do agree with the Commission's standard of a "suitable and available" warehouse. The permanent plan was accepted by the District Judge, we assume, upon the condition that the appropriation of warehouse space will be rigidly supervised and enforced by the Association.
 
 
 48
 In the circumstances we cannot declare the District Court in error for not sustaining B-B's indictment of the space excess as an antitrust evil.
 
 
 49
 IV. Lastly, B-B alleges it was denied an opportunity to show the Board its gain in the selling season of 1964, so as to obtain a larger allotment for 1965. The record does not sustain this grievance; on the contrary it indicates that ample opportunity was afforded B-B for the purpose. The failure to procure the allowance was due to no fault of the Association or the District Court.
 
 
 50
 The declarations and adjudications of the decree now on review will not be modified. In conclusion we observe, nevertheless, that the permanent plan is certainly not the ideal, nor do we hold it up as a criterion of reasonableness in all circumstances. We do not have the competence, as we pointed out of the first appeal, to construct plans. Our duty, as here, is simply to examine an existing plan and ascertain whether the legal infirmities imputed to it in truth exist.
 
 
 51
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 15 U.S.C. § 1 et seq
 
 
 [2]
 For a description of the marketing of bright leaf tobacco generally, and specifically of the operation of the Danville market, see Danville Tobacco Assoc. v. Bryant-Buckner Associates, Inc., supra, 333 F.2d 202, 204 (4 Cir. 1964) and citations therein. See, also Eagles v. Harriss Sales Corporation, 4 Cir., 368 F.2d 927 (1966)
 
 
 [3]
 On the special master's later recommendation, reflecting his awareness that the warehousemen had entered the 1962 season unaware that their performance could alter their subsequent allotments, the implementation of the experience adjustment system was delayed until 1964 in order that its first allotment adjustments would reflect 1963 sales statistics
 
 
 [4]
 The then stipulated space-unit was 87,529 square feet. 333 F.2d at 206. As noted herein, the figure has been rounded off to 87,500
 
 
 [5]
 For the computation see 333 F.2d at 208