W. Dalton LaRUE, Sr., et al., Appellants,

v.

Stewart L. UDALL, individually and as Secretary of the Interior,

and

North American Aviation, Inc., Appellees.

No. 17711.

United States Court of Appeals
District of Columbia Circuit.

Argued June 3, 1963.

Decided Oct. 3, 1963.

Mr. David Ginsburg, Washington, D. C., with whom Mr. Leonard N. Bebchick, Washington, D. C., was on the brief, for appellants.

Mr. Edmund B. Clark, Atty., Dept. of Justice, with whom Asst. Atty. Gen. Ramsey Clark, Messrs. Roger P. Marquis and Thomas L. McKevitt, Attys., Dept. of Justice, were on the brief, for appellee Udall.

Mr. Charles Pickett, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Warren E. Baker, Washington, D. C., was on the brief, for appellee North American Aviation, Inc. Mr. Joseph F. Healy, Jr., Washington, D. C., also entered an appearance for appellee North American Aviation, Inc.

Before BAZELON, Chief Judge, and WILBUR K. MILLER and BURGER, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

The appellants operate a cattle ranch located within the boundaries of Carson City Grazing District No. 3, Nevada. They own in fee about 1,600 acres in five non-contiguous tracts, and are licensed to graze their cattle on approximately 10,000 acres of public land. Due to the railroad grants of the Nineteenth Century, the area is made up of both publicly and privately owned tracts in a checkerboard pattern.

Appellee North American Aviation, Inc., is a large corporation engaged in the development and manufacture of rocket engines and rocket power plants and in research in that field. Having progressed to the point where it needed a very large body of land in an isolated area for the development of its program, North American acquired title to a considerable portion of the privately owned lands in the portion of Carson City Grazing District No. 3 heretofore utilized by the appellants. In order to complete its project, North American needed to acquire the large acreage of public lands under grazing license to the appellants.

In exchange for this portion of Carson City Grazing District No. 3, which has an appraised value of $86,400, North American offered the United States more than 20,000 acres lying within the boundaries of Winnemucca Grazing District No. 2, Nevada, which has an appraised value of $90,100. This land is a substantial distance from the land North American desired to obtain.

The appellants protested that the exclusion of their cattle from the area

sought by North American would seriously curtail, if not destroy, their ranching operation, as the lands owned by them in fee will not sustain it; and they asserted that § 8(b) of the Taylor Grazing Act [1] which authorizes the Secretary of the Interior in some circumstances to make such exchanges does not authorize the exchange proposed by North American. Arguments pro and con on appellants' protest, including affidavits and memoranda of law, were considered by the lower echelons of the Department and finally the matter reached the Secretary of the Interior. In a somewhat lengthy opinion, in which he discussed the matter in detail, the Secretary approved the exchange.

Thereupon, the appellants complained to the United States District Court for the District of Columbia, challenging the legality of the exchange so approved. The District Court having affirmed the Secretary's decision, the appellants brought this appeal.

They contend that § 8(b) of the Taylor Grazing Act does not authorize the Secretary of the Interior to issue a patent for public grazing land to a private organization for industrial use, even for national defense purposes, especially when his act in so doing will terminate a grazing license and destroy a ranching operation. Their principal argument is that § 8(b) authorizes the exchange of publicly owned grazing lands for privately owned lands only when the public interests in grazing on the public range and in conservation will be benefited thereby.[2] That North American will not use the lands for grazing or conservation purposes is not disputed.

The term "public interests" in § 8(b) is not defined by that section, nor is it limited or restricted in any way. If Congress had intended to restrict the meaning of those words in the manner urged by the appellants, we think it would have said so. Such a qualification could easily have been inserted in the statute. It seems to us that the Secretary correctly construed § 8(b) when he said in his opinion:

"* * * [T]he benefit to the public interests, which is the criterion of the statute, need not be related exclusively to conservation of Federal grazing resources nor need it be shown that a proposed exchange will promote range management. * * * [T]he Taylor Grazing Act is a multiple purpose act and while its chief immediate purpose was to stop injury to the public domain by unregulated grazing and to promote the stabliization of the livestock industry, section 1 of the act authorizes the Secretary of the Interior to establish grazing districts in order to promote the highest use of the public domain 'pending its final disposal.' Section 3 authorizes the Secretary to issue permits to graze livestock on such grazing districts but provides that the issuance of such permits shall not create any right, title, interest, or estate in or to the lands. Section 7, as amended by the act of June 26, 1936, authorizes the Secretary to examine and classify lands within grazing districts and to open such of those lands as he finds to be more valuable or suitable for other purposes than grazing or proper for acquisition in satisfaction

---

1. That section, which is 43 U.S.C. § 315g (b), is as follows:

"(b) When public interests will be benefited thereby the Secretary is authorized to accept on behalf of the United States title to any privately owned lands within or without the boundaries of a grazing district, and in exchange therefor to issue patent for not to exceed an equal value of surveyed grazing district land or of unreserved surveyed public land in the same State or within a distance of not more than fifty miles within the adjoining State nearest the base lands."

2. Appellants point out that a former Solicitor of the Department of the Interior took this view of the section and that, in this case, the Associate Director of the Bureau of Land Management so interpreted it.

of outstanding rights to disposition under applicable public land laws, after reasonable notice has been given to grazing permittees. Section 14 of the act (43 U.S.C., 1958 ed., sec. 1171) authorizes the Secretary to order into market and sell at public auction isolated or disconnected tracts of the public domain and tracts which are mountainous and too rough for cultivation.

"Thus nothing in the other sections of the act suggest that private interests may not acquire public land being used for grazing purposes to the detriment of those licensed to use the land."

We observe, moreover, that § 8(b) expressly authorizes the Secretary to exchange surveyed public land for privately owned land outside a grazing district. It is also true, as the Secretary's opinion pointed out, that North American's acquisition of large acreage of privately owned land in the area of the selected land has reduced the importance of grazing in the area.

■ Even under appellants' restricted view of the meaning of the statutory words "public interests," it is clearly the Secretary's duty, in considering a proposed exchange, to consider its net result: to compare the advantages which the offered land would bring to conservation and the grazing industry with any disadvantage to those interests which might result to them from the withdrawal of the selected lands from a grazing district. This the Secretary seems to have done, as he held "that acquisition of the offered lands would block out holdings of public lands and would facilitate the administration and management of the area for grazing purposes." Thus appellee Udall gave another reason for approving the exchange in addition to his interpretation of § 8(b). We think he was right in both respects.

■ Appellants also assert that their grazing unit has been and is pledged as security for *bona fide* loans, and that therefore the Secretary may not termi-

nate their grazing permit. As a basis for the assertion they rely upon the language we have italicized in the following portion of § 3 of the Taylor Grazing Act (43 U.S.C. § 315b):

"* * * Preference shall be given in the issuance of grazing permits to those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights, as may be necessary to permit the proper use of lands, water or water rights owned, occupied, or leased by them, except that until July 1, 1935, no preference shall be given in the issuance of such permits to any such owner, occupant, or settler, whose rights were acquired between January 1, 1934, and December 31, 1934, both dates inclusive, except that *no permittee complying with the rules and regulations laid down by the Secretary of the Interior shall be denied the renewal of such permit, if such denial will impair the value of the grazing unit of the permittee, when such unit is pledged as security for any bona fide loan.* * * *"

Their contention is that if the Secretary may not refuse to renew a permit when the permittee's grazing unit is pledged as security for a *bona fide* loan,. "he can hardly bring about the same result indirectly by terminating a permit prior to the expiration of the term * *." As the context shows, the provision relied upon by the appellants is one of the factors to be considered by the Secretary in establishing preferences between conflicting applications for permits on the federal range. By no means should it be construed as providing that, by maintaining a lien on his grazing unit, a permittee may also create and maintain a vested interest therein which will prevent the United States from exchanging it under § 8(b).

■ Another point on appeal is thus stated by the appellants:

"Appellee Udall acted unlawfully and deprived appellants of due proc-

ess (a) by denying a full and fair hearing in derogation both of the provisions of the Taylor Grazing Act and the Fifth Amendment; (b) by denying access to the full record on which appellee Udall's decision was based; and (c) by denying appellants the protection afforded by the Administrative Procedure Act."

As appellants were heard at length on their protest against the proposed exchange, it is apparent their real complaint is that no formal evidentiary hearing was held. We find nothing in the Taylor Grazing Act which requires a hearing on such a protest. Section 8, dealing with exchanges, merely requires publication of notice of a contemplated exchange. Where Congress intended a hearing to be held, it provided therefor in express terms, as it did in § 1 of the Taylor Grazing Act (43 U.S.C. § 315):

"* * * Before grazing districts are created in any State as herein provided, a hearing shall be held in the State, after public notice thereof shall have been given, at such location convenient for the attendance of State officials, and the settlers, residents, and livestock owners of the vicinity, as may be determined by the Secretary of the Interior. No such district shall be established until the expiration of ninety days after such notice shall have been given, nor until twenty days after such hearing shall be held * * *."

■ Section 9 of the Act (43 U.S.C. § 315h) does provide for "local hearings on appeals from the decisions of the administrative officer in charge in a manner similar to the procedure in the land department." We think the provision does not apply to applications for exchange under § 8(b), a matter in which no local administrative officer is "in charge," but only to matters that arise in the administration of grazing districts.

3.  113 U.S.App.D.C. 68, 74, 304 F.2d 944, 950, cert. denied sub nom. Hansen v.

Appellants' reliance on the Fifth Amendment disregards the provision of § 3 of the Act (43 U.S.C. § 315b) that

"* * * So far as consistent with the purposes and provisions of this chapter, grazing privileges recognized and acknowledged shall be adequately safeguarded, but the creation of a grazing district or the issuance of a permit pursuant to the provisions of this chapter shall not create any right, title, interest, or estate in or to the lands."

The command of Congress that grazing privileges shall be adequately safeguarded "so far as consistent with the purposes and provisions of this chapter" does not mean that a grazing permit is to prevent the Government's exercise of the right of exchange, which is "one of the provisions of this chapter."

■ The Administrative Procedure Act does not require a hearing here, as § 5 of that measure (5 U.S.C. § 1004) applies only to agency action which the agency statute provides must be preceded by a hearing. Springfield Airport Authority v. C. A. B., 109 U.S.App.D.C. 197, 198 n. 1, 285 F.2d 277, 278 n. 1 (1960).

We have carefully considered all the other contentions made by the appellants, but do not find in them any reason for disturbing the Secretary's decision. As we said in Safarik v. Udall: [3]

"It is obvious that the Secretary of the Interior, in carrying out his functions in the administration and management of the public lands, must be accorded a wide area of discretion and it is a well-recognized rule that administrative action taken by him will not be disturbed by a court unless it is clearly wrong."

Instead of being clearly wrong, the Secretary's action seems to us to have been quite correct. The District Court's judgment upholding his decision will be affirmed.

It is so ordered.

Udall, 371 U.S. 901, 83 S.Ct. 206, 9 L.Ed. 2d 164 (1962).

BAZELON, Circuit Judge (concurring).

Under § 8(b) of the Taylor Grazing Act, 43 U.S.C. § 315g(b) (1958), any landowner may propose to exchange his land ["offered" lands] for federal land of equal value located within a grazing district ["selected" lands]; and the Secretary of the Interior may approve the exchange if "public interests will be benefited thereby." In this case, because the Secretary viewed the Taylor Act as a "multiple purpose" statute, he construed the term "public interests" as a broad reference to the general public interest, rather than being limited to grazing interests. In approving the exchange, the Secretary relied heavily on his finding that the exchange would benefit the general public interest, but he also found that the exchange would benefit grazing interests.[1] This court holds that the exchange may be approved on either ground. I think approval can rest only on a finding of benefit to grazing interests.

The Taylor Grazing Act of 1934[2] closed the public domain, climaxing the reversal of earlier policy which had encouraged disposal of the public lands to private ownership.[3] The policy of land conservation—retaining federal ownership and regulating land use to prevent depletion of natural resources—began with the creation of forest reserves after 1891.[4] The Taylor Act extended this policy to the remaining 173,000,000 acres of public lands still unreserved by 1934. To prevent soil deterioration and stabilize the livestock industry which constituted the chief user of this public range,[5] the Secretary of the Interior was authorized to reserve suitable lands for the creation of grazing districts and to regulate grazing within the districts by issuing permits.[6] It was recognized however, that the existing checkerboard pattern of alternating public and private ownership, resulting from the course of land settlement during the nineteenth century,[7] would make it difficult to administer the districts efficiently.[8] To meet this problem, § 8 of the Act was designed to foster consolidation in the manner of earlier forest reserves legis-

---

1. The Secretary's finding of grazing benefit appears from his statements that the importance of grazing in the area of the selected lands has lessened in recent years, and that "acquisition of the offered lands would block out holdings of public lands and would facilitate the administration and management of the area for grazing purposes." W. Dalton LaRue, Sr., A–29309 (1962).

2. Act of June 28, 1934, 48 Stat. 1269 (1934), as amended, 43 U.S.C. §§ 315, 315a–315r (1958).

3. See, e. g., Hearings on H.R. 6462 Before the Senate Committee on Public Lands and Surveys, 73d Cong., 2d Sess. 46 (1934) (statement by Senator O'Mahoney of Wyoming). See ROBBINS, OUR LANDED HERITAGE 285–423, especially 421–23 (1950); PEFFER, THE CLOSING OF THE PUBLIC DOMAIN 5, 8–231, 302–41 (1951); CLAWSON & HELD, THE FEDERAL LANDS 15–36 (1957) (Marion Clawson was Director of the Bureau of Land Management in 1948–53).

4. 26 Stat. 1103 (1891), as amended, 16 U.S.C. § 471 (1958).

5. See S.REP. No. 1182, 73d Cong., 2d Sess. (1934); H.R.REP. No. 903, 73d Cong., 2d Sess. (1934); 78 CONG.REC. 6346, 6364–65 (1934). See also Ickes, The National Domain and the New Deal, SATURDAY EVENING POST Dec. 23, 1933, p. 10.

6. Section 1 of the Act originally limited the total amount of land which could be included in grazing districts to 80,000,000 acres. This limitation, inserted to curb the power of the Secretary, 78 CONG.REC. 11140 (1934), was shortly abandoned in order to allow maximum application of the Taylor Act's policies. 49 Stat. 1976 (1936); 68 Stat. 151 (1954); see 80 CONG.REC. 3815–16 (1936). Today there are 161,000,000 acres of federal land in 58 grazing districts. BUREAU OF LAND MANAGEMENT, PUBLIC LAND STATISTICS, Table 81 (1962).

7. Behind the checkerboard pattern is the familiar history of free land entry, railroad land grants, and school land cessions to the States. See Hibbard, Land Grants, 9 ENCYC. SOC. SCI. 32 (1937).

8. H.R.REP. No. 903, 73d Cong., 2d Sess. 3, 7 (1934). See CLAWSON & HELD 48–50.

lation:[9] the Secretary was authorized to accept land which would consolidate the grazing districts, either by gift or in exchange for other grazing land of equal value.[10]

The legislative history of the Act shows that in authorizing the Secretary to convey public lands to private individuals as part of an exchange, § 8(b) was intended not as a new source of power to alienate federal lands, but simply to promote consolidation of the grazing districts.[11] As such, I think that the determination that "public interests will be benefited [by an exchange]" includes only public interests in furtherance of the grazing and range stabilization policies which are the subject of the Act. The term was so construed in an opinion rendered by the Solicitor of the Department of the Interior shortly after the Act's passage,[12] and there is no basis for the Secretary's suggestion that amendments since 1934 have changed the meaning of § 8.[13]

The Secretary argues that where Congress wished to consider only grazing interests, it said so. For this proposition, he cites § 8(a), dealing with the acceptance of gift lands, which requires the specific showing that the acquisition will "promote the purposes of a district or facilitate the administration of the public lands." But I do not think the more general language in § 8(b) was intended to allow the Secretary to go beyond grazing interests for his standards. Rather, it indicates that in an exchange of lands, there will be more than one factor to consider under the heading of grazing interests. Thus where the Government is conveying land as well as procuring land, it must consider the effect of the transaction not only on administration of the grazing district of the offered land, but also its effect on administration of the grazing district of the selected land and on the interests of grazing licensees of the land to be conveyed.[14] While offered land might meet the required standards, the detriment involved in giving up the selected lands might outweigh the benefit. In Willis N. Farlow, 62 I.D. 206 (1955), a proposed exchange of lands equally valu-

9. 42 Stat. 465 (1922), 16 U.S.C. § 485 (1958); 43 Stat. 1215 (1925), 16 U.S.C. § 516 (1958). See also 16 U.S.C. §§ 486a–486w (1958).

10. Section 8, Act of June 28, 1934, 48 Stat. 1272 (1934) as amended, 43 U.S.C. § 315g (1958):
"(a) *Where such action will promote the purposes of a district or facilitate the administration of the public lands,* the Secretary is authorized to accept on behalf of the United States any lands within or without the exterior boundaries of a grazing district as a gift.
"(b) *When public interests will be benefited thereby* the Secretary is authorized to accept on behalf of the United States title to any privately owned lands within or without the boundaries of a grazing district, and in exchange therefor to issue patent for not to exceed an equal value of surveyed grazing district land * * *.
"(c) Upon application of any State to exchange lands within or without the boundaries of a grazing district the Secretary of the Interior shall, and is hereby, directed to proceed with such exchange at the earliest practicable date * * *."
[Emphasis supplied.]

11. See 78 Cong.Rec. 6359 (1934); Senate Hearings on H.R. 6462, supra note 3, at 94–100. In the Hearings, Representative Taylor said:
"But I would like to say that under this bill it is not intended to make a general exchange arrangement outside, where they [the lands] have nothing to do with this bill." Id. at 98.

12. Land exchange with States under Taylor Grazing Act, 55 I.D. 9 (1934).

13. The only major change was a 1936 amendment eliminating an ambiguity in regard to State exchanges. 49 Stat. 1976 (1936); see Hearings on S. 2359 Before the Senate Committee on Public Lands and Surveys, 74th Cong., 1st Sess. 47–78 (1935). Sections 8(a) and 8(b) have been amended to permit the Secretary to accept land situated outside the boundaries of a grazing district, 49 Stat. 1976 (1936); 62 Stat. 533 (1948). But it appears that these amendments were for the limited purpose of acquiring land needed for stock driveways adjacent to grazing districts. Cf. S.Rep. No. 1497, 80th Cong., 2d Sess. (1948), U.S. Code Congressional Service 1948, p. 1929.

14. Although § 3, 43 U.S.C. § 315b (1958), provides that issuance of a grazing permit

able for grazing was disapproved because of the detrimental effect on two ranchers.

This court agrees with the Secretary that private interests may acquire public grazing land to the detriment of grazing licensees.[15] I also agree. But that does not answer the question in this case. The question here is whether or not such an acquisition *under the exchange provisions of § 8(b)* requires a determination that the net effect of the exchange will benefit public grazing interests. I think this determination is required, and that the grazing value of the offered land is a critical consideration.[16]

A contrary conclusion would be inconsistent with the over-all congressional policy sharply limiting the Secretary's authority to remove land from public ownership. Since 1891, when general alienation of public land was forbidden, land sales have been permitted only by specific legislation.[17] Such legislation is presently limited to a handful of special-purpose statutes, none of which authorizes the sale of land in excess of 1520 acres in a single transaction.[18] The Secretary here claims a grant of authority under § 8(b) which greatly exceeds that under any other public land law.

The Taylor Act reflects Congress' determination to limit the Secretary's power.[19] This purpose was reconfirmed as recently as 1958 by the legislative reaction to administrative claims—based on national defense needs—to greater authority over the public lands. Following a report criticizing excessive land demands by the military departments,[20] Congress amended existing legislation authorizing reservation of land for military purposes[21] to require specific congressional authority for each reservation exceeding 5,000 acres.[22] The purpose of

---

shall not create any vested right, it also states that "[s]o far as consistent with the purposes and provisions of this chapter, grazing privileges recognized and acknowledged shall be adequately safeguarded." See Oman v. United States, 179 F. 2d 738 (10th Cir. 1949); Red Canyon Sheep Co. v. Ickes, 69 App.D.C. 27, 98 F.2d 308 (1938). Thus, while the existence of an outstanding permit does not preclude an exchange, it is a relevant consideration.

15. Section 3 of the Act requires the Secretary to renew permits where the grazing unit covered is pledged as security for a bona fide loan. The purpose of this provision was to encourage bank credit, see Hearings on S. 2359 Before the Senate Committee on Public Lands and Surveys, 74th Cong., 1st Sess. 37–39 (1935); 78 Cong.Rec. 11151–55, 11162 (1934), but there was no indication that it was intended to limit the Secretary's power to consolidate districts by land exchange.

16. Appellees cite two exchanges approved by the Secretary under § 8(b) to show that offered lands need not be valuable for grazing: In Elbert O. Jensen, 60 I.D. 231 (1948), the exchange was approved although the offered land was situated within a national forest, and not under the jurisdiction of the Taylor Act. But that case is distinguishable because similar land conservation policies underlie the creation and administration of the forest reserves and the grazing districts, and because grazing is one of the major issues of forest lands. See CLAWSON & HELD 57–60, 200. See also 76 Stat. 140 (1962), 43 U.S.C. § 315g–1 (Supp. IV 1959–1962); H.R.REP. No. 1418, 87th Cong., 2d Sess. (1962). In Owen Ault, A–27845, which was not appealed, the Secretary based his approval of a proposed exchange on national defense interests. I think he erred.

17. 26 Stat. 1099 (1891), 43 U.S.C. § 671 (1958).

18. The major provisions are at 43 U.S.C. §§ 321–339, 351–360, 682a–682e, 1171–1177 (1958). See summary in CLAWSON & HELD 391–92.

19. See, e. g., 78 Cong.Rec. 11140–43 (1934).

20. S.REP. No. 857, 85th Cong., 1st Sess. (1957). See also H.R.REP. No. 2856, 84th Cong., 2d Sess. (1956).

21. 10 U.S.C. § 2667 (1958).

22. 72 Stat. 27 (1958), 43 U.S.C. §§ 155–158 (1958).

the amendment, as described in the Senate Committee Report, was:

> to return from the executive branch to the Congress—to the extent that [public] lands are involved—the responsibility imposed by the Constitution on the Congress for their management.[23]

Nevertheless, in the present case, appellees argue that the special importance of national defense justifies a broad reading of § 8(b). But Congress has provided a method for making land—including grazing land—available for national defense. Under § 7 of the Taylor Act, land found "more valuable or suitable for any other use" than grazing may be reclassified and opened for "disposal in accordance with such classification under applicable public-land laws."[24] And 10 U.S.C. § 2667 (1958) authorizes a private lease "[w]henever the Secretary of a military department considers it advantageous to the United States." This procedure, although not as expeditious as a § 8(b) exchange,[25] is the one fixed by Congress for accommodating national defense interests.

The decrease in grazing since 1934,[26] together with the growing importance of Western commercial and industrial development, may indicate that the Taylor Act's emphasis on grazing is outdated. But Congress has not said so, nor has Congress relaxed its concern with land conservation and retention of federal ownership.[27] If changed circumstances require a view of "public interests" under § 8(b) that goes beyond grazing interests, Congress—not the Secretary— must say so.[28]

23. S.REP. No. 857, 85th Cong., 1st Sess. 3 (1957).

24. 43 U.S.C. § 315f (1958).

25. Since the selected land in this case exceeds 5000 acres, specific congressional approval would be required. See note 22 supra. In addition, North American Aviation would not gain fee title to the land, and holders of grazing licenses would be entitled to compensation for the destruction of their licenses. 56 Stat. 654 (1942), as amended, 43 U.S.C. § 315q (1958).

26. See CLAWSON & HELD 335.

27. See INT.DEPT.ANN.REP. (1962): New Horizons in Resource Conservation, IX–LXXVI, especially XLVI–L. See also CLAWSON & HELD 346–47.

28. Congress considered legislation on the subject in 1963. See S. 601, S. 1598, S. 1599, S. 1600, S. 1601, and S. 1602, 88th Cong., 1st Sess. (1963). See also SENATE COMM. ON INTERIOR AND INSULAR AFFAIRS, 88TH CONG., 1ST SESS., THE PUBLIC LANDS (Comm. Print 1963).