**JORSKI MILL & ELEVATOR CO., Inc., and Millers Mutual Insurance Association of Illinois, Appellants,**

v.

**FARMERS ELEVATOR MUTUAL INSURANCE COMPANY, Appellee.**

No. 9228.

United States Court of Appeals
Tenth Circuit.

Oct. 4, 1968.

Rehearing Denied Nov. 21, 1968.

Wilbur K. Miller, Senior Circuit Judge, dissented in part.

Walter D. Hanson, Oklahoma City, Okl. (Hanson, Fisher, Tumilty, Peterson, Melton & Tompkins and John Garrett, Oklahoma City, Okl., on the brief), for appellants.

J. Edward Barth, Oklahoma City, Okl. (Barefoot, Moler, Bohanon & Barth, Oklahoma City, Okl., and Major C. Ginsberg, Dallas, Tex., of counsel, on the brief), for appellee.

Before WILBUR K. MILLER*, BREITENSTEIN and SETH, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Appellee-plaintiff Farmers Elevator Mutual Insurance Company paid the Commodity Credit Corporation, an agency of the United States, for a loss sustained by the failure of appellant-defendant Jorski Mill & Elevator Co., Inc., to perform obligations assumed by it under a Uniform Grain Storage Agreement which it had made with CCC. Farmers sued Jorski and its surety, appellant-defendant Millers Mutual Insurance Association of Illinois, to recover the amount paid. The appeal is from the judgment in favor of Farmers.[1]

The storage agreement with Jorski was made under the applicable federal statutes[2] and became effective on June 30, 1960. As required by the statute, Jorski furnished CCC with a warehouseman's bond, dated May 23, 1963, in the penal sum of $100,000, later increased to $105,000, with Millers as surety. On April 8, 1964, Jorski, when demand was made, failed by about 19,000 bushels to load out the wheat stored with it by CCC. The Shortage Review Committee of CCC determined that the shortage was non-operational and did not result from normal and prudent warehousing practices. In such a situation CCC is entitled to recover the storage charges theretofore paid by it on the undelivered grain as well as the value of the grain.

In 1963, after an extensive study, CCC determined that it needed greater bond coverage for its stored grain than that provided by the standard warehousemen's bonds. On June 19, 1963, CCC and Farmers entered into a contract styled "CCC Blanket Insurance Policy," the penal sum of which was $50,000,000. By an amendment effective the same day,

Jorski agreed with CCC to an amendment to the storage agreement providing for the blanket coverage. Of such coverage, $947,000 was allotted to Jorski and it paid the premium thereon.

After the shortage and ensuing demand, Farmers paid the CCC claim. It then sued Jorski and Millers and recovered a joint and several judgment against them in the sum of $49,835.25 with interest.

On the appeal of Jorski little need be said. Its only explanation of the shortage was the speculation that it was due to theft, and the trial court correctly rejected this defense. Jorski says that the blanket coverage by Farmers was for its benefit because it paid part of the premium. The answer is that the amendment to the storage agreement provides that the additional coverage does not relieve a warehouseman of any of his obligations or inure to his benefit.

Jorski argues that CCC may not recover the storage charges on the undelivered wheat on the ground that the finding of the Shortage Review Committee that the shortage was not due to normal and prudent warehousing practices violates the Administrative Procedure Act[3] because it was not afforded a hearing. The Administrative Procedure Act "applies only to agency action which the agency statute provides must be preceded by a hearing."[4] No statute has been called to our attention which requires a hearing before a determination by the Shortage Review Committee. Moverover, § 17(d) of the storage agreement provides that CCC may determine whether disposition of grain contrary to the agreement "resulted from normal and prudent warehousing practices."

The argument that Farmers may not be subrogated to the rights of CCC against Jorski borders on frivolity. Farmers did not pay as a volunteer but

---

* Of the District of Columbia Circuit, sitting by designation.

1. See opinion of trial court, Farmers Elevator Mut. Ins. Co. v. Jorski Mill & Elevator Co., W.D.Okl., 259 F.Supp. 755.

2. See United States Warehouse Act, 7 U.S.C. §§ 241–273.

3. 5 U.S.C. § 1001 et seq.

4. LaRue v. Udall, 116 U.S.App.D.C. 396, 324 F.2d 428, 432.

because it was contractually bound to pay upon the default of Jorski.

■ The real controversy is between the two insurance carriers. The insuring contract issued by Farmers to CCC is unique. It is designated a "blanket insurance policy." The expression "blanket policy" is a term of art in the insurance field and "contemplates that the risk is shifting, fluctuating or varying, and is applied to a class of property rather than to any particular risk or thing." [5] A blanket policy is ordinarily regarded as excess insurance over and above specific insurance [6] and does not apply until the specific insurance has been exhausted. [7] The Farmers policy is different in that it has a specific provision for prompt payment to CCC. The only requirement on CCC is that it "make reasonable efforts, * * * short of litigation" to collect. The Farmers policy applies immediately and does not await the exhaustion of the specific insurance.

In the case at bar Farmers paid promptly. Its insured has been satisfied and does not appear in this litigation. The question is the right of Farmers to recoup from Millers and the amount of recoupment.

■ Millers makes two contentions. First, it says that Farmers paid a claim which was not within the coverage of its contract and that a volunteer is not entitled to subrogation. The point is without merit. The trial court found a "failure of Jorski to load about the approximately 19,000 bushels of CCC wheat." [8] This failure was a violation of the warehouse agreement and within the liability provisions of the Farmers policy.

The second contention is that if Farmers was liable under its policy, it covered the same loss by the same entity as was covered by the Millers policy with the result that Farmers and Millers were cosureties and must bear the loss proportionately. The Farmers policy generally, and the Millers policy specifically, covered the same risk, violation of a warehouse agreement, and protected the same obligee, the CCC. The Millers policy covers the default of a named principal, Jorski, and the Farmers policy covers the failure of "any warehouseman" to perform the obligations imposed by the storage agreements. The elements of cosuretyship, same obligee, principal, and risk, are present, but the presence of these elements must be considered in connection with other facts.

The Farmers policy expressly permits other coverage and provides:

"10. *Subrogation.* In the event of any payment under this policy the insurer shall, to the full extent permitted by law, be subrogated to all of CCC's rights of recovery therefor against the warehouseman and any other person or other legal entity to the extent of such payment."

Upon the payment by Farmers, CCC agreed that:

" * * * Farmers Elevator Mutual Insurance Company is subrogated to the full extent permitted by law, as provided in such Blanket Insurance Policy, to all of CCC's rights of recovery against Millers Mutual Insurance Association, and any other person or other legal entity to the extent of such payment."

■ By the terms of its policy Farmers had the right of subrogation and that right was confirmed by the action of CCC. It is urged that subrogation is an equitable doctrine and may

5. National Bank of Burlington v. Fidelity & Casualty Co. of New York, 4 Cir., 125 F.2d 920, 924, 140 A.L.R. 694. See also Reliance Ins. Co. v. Orleans Parish School Board, 5 Cir., 322 F.2d 803, 805–806, cert. denied 377 U.S. 916, 84 S.Ct, 1180, 12 L.Ed.2d 186, and 6 Appleman, Insurance Law and Practice, § 3912, p. 297.

6. 6 Appleman, Insurance Law and Practice, § 3912, p. 300.

7. Wilson & Co. v. Hartford Fire Ins. Co., 300 Mo. 1, 254 S.W. 266, 282.

8. Farmers Elevator Mut. Ins. Co. v. Jorski Mill & Elevator Co., W.D.Okl., 259 F.Supp. 755, 758.

not be created by contract. Recognition of the principle that subrogation may arise, independently of contract, because of legal or equitable considerations does not mean that subrogation may not arise out of contract. Indeed, there are two kinds of subrogation, (1) legal or equitable, and (2) conventional. Conventional subrogation arises only by reason of an express or implied agreement.[9] The statements in Hartford Accident & Indemnity Co. v. First Nat. Bank & Trust Co., 10 Cir., 287 F.2d 69, 71; Pearlman v. Reliance Ins. Co., 371 U.S. 132, 137, 83 S.Ct. 232, 9 L.Ed.2d 190 and Memphis & Little Rock R. R. Co. v. Dow, 120 U.S. 287, 301–302, 7 S.Ct. 482, 30 L.Ed. 595, all refer to legal or equitable subrogation and do not deny that conventional subrogation exists by contract. Subrogation is the substitution of one person in the place of another with reference to a lawful claim, demand or right.[10] The substitution may occur through the invocation of the "doctrine" of subrogation or it may be confirmed and acquiesced in by contract. Neither method is exclusive.

The lack of assent by Millers to the Farmers policy is immaterial. In its policy Millers expressly waived notice of modifications of the warehouse agreement. The Farmers policy was issued after amendment to that agreement in which specific reference is made to the acquisition by CCC of a "blanket insurance policy or blanket bond."

The intent of CCC and Farmers was that Farmers should make prompt payment of losses incurred by defaults of warehousemen and should be subrogated to the rights of CCC to recover from others. They had the right to, and did, contract for subrogation. The contention is that even though the parties did so contract Farmers and Millers were cosureties and between cosureties there may be only contribution in proportion to the penalties of the policies.[11] The difficulty with this position is that it fails to distinguish between a cosurety and a supplemental or subsurety.

■■■ A surety may stipulate to be a supplemental or subsurety provided that it is under no duty to assume a greater liability and that its stipulation will not inequitably increase the obligation of another surety.[12] Here Millers was already bound to CCC and Farmers had no existing duty to Millers. The issuance of the Farmers policy did not increase the obligation of Millers. In such circumstances the subsequent surety can conclusively stipulate as to the relationship by an appropriate manifestation of intent.[13] Farmers made its intent clear by its policy provision for subrogation. The intent of CCC is clear because after the payment by Farmers, CCC expressly agreed that Farmers was subrogated to the CCC rights against Millers.

This situation is not changed by the statement in the Farmers policy that it shall be subrogated "to the full extent permitted by law." The law recognizes both cosuretyship and subsuretyship. Farmers contracted to be a subsurety. As such its right against Millers is for full recoupment, not proportionate contribution.

Affirmed.

WILBUR K. MILLER, Senior Circuit Judge (concurring in part and dissenting in part):

I concur in that portion of the foregoing opinion which affirms the judgment against Jorski, but I dissent from

---

9. Commercial Standard Ins. Co. v. American Employers Ins. Co., 6 Cir., 209 F.2d 60, 64; Hardware Mut. Ins. Co. v. Dunwoody, 9 Cir., 194 F.2d 666, 668; In re Rogers Palace Laundry Co., 7 Cir., 275 F. 829, 830; United States Fidelity & Guaranty Co. v. Slifkin, N.D.Ala., 200 F. Supp. 563, 568–569; In re Lauer, D.N.J., 38 F.Supp. 691, 696; Evans' Adm'r v. Evans, 304 Ky. 28, 199 S.W.2d 734, 737; Gore v. Brian, N.J.Ch., 35 A. 897, 898; 11 Appleman, Insurance Law and Practice, § 6501, p. 292.

10. Black's Law Dictionary, 4th ed. p. 1595.

11. See 11 Appleman, Insurance Law and Practice, § 6771, pp. 664–667.

12. Restatement, Security, § 146(c), p. 405.

13. Id. at 409 and 412.

the affirmance of the judgment against Millers, which gives an undeserved windfall to Farmers. The majority bases its action upon what I think is its erroneous conclusion that Farmers was a supplemental surety for, instead of a cosurety with, Millers Mutual Insurance Association. Whether so or not is the crucial question in the case; for, if Farmers was a cosurety with Millers, it was only entitled to recover from Millers, under the doctrine of contribution, the latter's proportionate part of the entire loss. In order to demonstrate my reasons for dissenting, it is necessary to restate in more detail the origin and nature of the obligations of the two insurance companies.

On May 23, 1963, Jorski executed to CCC a warehouseman's bond in the penal sum of $100,000—later increased to $105,000—with Millers Mutual as surety, that Jorski would faithfully perform all its obligations as a licensed warehouseman. On June 19, 1963, Farmers executed to CCC a blanket bond in the penal sum of $50,000,000 by which it promised to answer for any failure of a warehouseman to perform fully his obligations. Of this large additional coverage, $947,000 was allotted to Jorski, which paid the premium thereon. Thus, thereafter the total penal sum of $1,052,000 insured the performance of Jorski's duties under its contract with CCC.

The obligations of the bonds of Farmers and Millers, while not identical in language, are substantially identical in purpose; both undertake to pay CCC for any loss because of Jorski's failure to perform fully its duties and obligations as a warehouseman under the Uniform Grain Storage Agreement. This is readily seen when the insuring clauses of the two bonds are compared. That of the Millers' bond reads as follows:

"Now, therefore, if the said license(s) or any amendment(s) thereto be granted and said principal shall faithfully perform all of its obligations as a licensed warehouseman relating to transactions entered into during the period of one year commencing May 29, 1963 under the terms of the said United States Warehouse Act and the said regulations prescribed thereunder, and such additional obligations of the warehouseman as may be assumed by it during the period aforesaid under contracts with the respective depositors of the hereinbeforenamed product(s) in such licensed warehouse(s), and any and all modifications of said United States Warehouse Act, regulations, and contracts that may hereafter be made, notice of which modifications of the surety being hereby waived, then this obligation shall be null and void and of no effect, otherwise to be and remain in full force and virtue."

The Farmers' insuring clause is as follows:

"1. *Liability.* The insurer shall pay CCC any and all amounts which CCC shall be entitled to recover from any warehouseman because of any failure of the warehouseman to perform fully its obligations under the Uniform Grain Storage Agreement, Form CCC–25 (5–17–60), and all modifications of such agreement or to perform any other obligations as a warehouseman in connection with commodities stored or handled under such agreement * *. *Other insurance or bond coverage is permitted covering the same risks without affecting the liability of the insurer under this policy."* (Emphasis supplied.)

Thus both insurance companies undertook to answer to CCC for any default by Jorski in the performance of its obligation under the Uniform Grain Storage Agreement. There is nothing in the Farmers' bond, nor is there anything in the record which has been called to my attention, to indicate that Farmers was a supplemental surety for Millers, nor that the bond had any purpose other than to protect CCC from losses occasioned by the defaults of warehousemen. The terms of Farmers' obligation patently picture it as a surety for Jorski only, and its payment to CCC indicates that it regarded itself as such. It follows, there-

fore, that the execution of Farmers' contract made it a cosurety with Millers; the fact that they became sureties at different times and by different instruments does not, it is held, prevent the creation of cosuretyship, which is the relation between two or more sureties who are bound to answer for the same duty of the principal, and who as between themselves must share any loss caused by the default of the principal.

The majority opinion admits that

" * * * The Farmers policy generally, and the Millers policy specifically, covered the same risk, violation of a warehouse agreement, and protected the same obligee, the CCC. The Millers policy covers the default of a named principal, Jorski, and the Farmers policy covers the failure of 'any warehouseman' to perform the obligations imposed by the storage agreements. * * *"

and that "[t]he elements of cosuretyship, same obligee, principal, and risk, are present," but adds that "the presence of these elements must be considered in connection with other facts." The only "other fact" stated by the majority as transforming an undoubted cosuretyship into a supplemental suretyship is the following paragraph of the Farmers' policy:

"10. *Subrogation.* In the event of any payment under this policy the insurer shall, to the full extent permitted by law, be subrogated to all of CCC's rights of recovery therefor against the warehouseman and any other person or other legal entity to the extent of such payment."

My colleagues infer that this paragraph negated all the indicia of cosuretyship and made Farmers a supplemental surety. If the draftsman of the Farmers' policy, after investing Farmers with all the attributes of a cosurety, had actually intended to provide that Farmers should only be a supplemental surety for, instead of a cosurety with, existing sure-

ties, he would hardly have been content to leave his attention to be inferred, and particularly from such a doubtful paragraph. The writer of the contract would have been careful to provide in express language that, despite all the indicia of cosuretyship, it was really intended that Farmers should be a supplemental surety, and if CCC had intended the Farmers' insurance to be only supplemental to existing suretyships, I am sure it would have insisted upon specific language to that effect, which could very simply have been supplied.

We know, however, that CCC did not so intend. It did not obtain the Farmers' contract in order to have a surety for the sureties on the existing warehousemen's bonds. It merely wanted more protection dollarwise than that afforded by the warehousemen's bonds, the penal sums of which it concluded were inadequate. Fortunately, we have in the record, in CCC's own words, its reason for taking the Farmers' policy: not to obtain a surety for the sureties on its existing warehousemen's bonds, but to obtain *additional* coverage, because an extensive study had convinced it that the warehousemen's bonds did not provide enough coverage to protect its financial interest in grain stored under Uniform Grain Storage agreements. CCC said it chose the Farmers' blanket coverage arrangement because "[t]o increase this coverage on the basis of individual bonds would result in substantially increased cost to most warehousemen." The blanket coverage affords CCC, it said, "the substantial increased coverage at a very reasonable cost."

This is amply evidenced by the following quotation from a letter of December 19, 1963, addressed to Jorski by CCC:

"Enclosed is the statement for your proportionate share of the cost of the premium on the blanket insurance policy. The charge in the enclosed statement has been computed in accordance with the formula set forth in the amendment to the Uniform Grain

Storage Agreement which you recently executed in connection with the blanket insurance policy.

"About a year and a half ago an extensive study was conducted of the bond requirements of the Commodity Credit Corporation under its Uniform Grain Storage Agreement and our claims experience with respect to warehouse-stored grain. The conclusions reached in the study showed a need for a substantial increase in bond coverage to protect CCC's financial interest in grain stored under its Uniform Grain Storage Agreement. To increase this coverage on the basis of individual bonds would result in substantially increased cost to most warehousemen. In addition, many warehousemen who have not been required to furnish bond to CCC in the past, either because they were licensed under the U. S. Warehouse Act or the bonds required for State licensing were equal to or exceeded CCC's requirements, would have been required to do so based upon the results of the study. The blanket coverage affords CCC the substantial increased coverage at a very reasonable cost."

In order to appraise the effect of the subrogation clause of the Farmers' bond, above quoted, it is necessary, to determine what form of subrogation is provided therein. There are two kinds of subrogation recognized by the courts: (a) true subrogation, which is often called "legal" or, by reason of its origin and basis, "equitable" subrogation; and (b) so-called "conventional" or contractual subrogation. True subrogation does not depend upon contract and arises only when the equities of the party seeking it are superior to the equities of the party against whom it is sought. Hartford Accident & Indemnity Co. v. First National Bank & Trust Co. of Tulsa, 287 F.2d 69 (10th Cir. 1961). In Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136–137, 83 S.Ct. 232, 235, 9 L.Ed.2d 190 (1962), the Supreme Court said:

"* * * Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimbursement, even without a contractual promise such as the surety here had.[12] And probably there are

"12. 'The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties.' Memphis & L. R. R. Co. v. Dow, 120 U.S. 287, 301–302 [7 S.Ct. 482, 488, 489, 30 L.Ed. 595] (1887)."

few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed. This rule, widely applied in this country and generally known as the right of subrogation, was relied on by the Court of Appeals in this case. * * *"

This was a clear holding by the Supreme Court that the right of subrogation of the surety in the *Pearlman* case arose, not from the contractual promise it had, but from the equities of the situation: the fact it had been compelled to pay the debt of another. The Court reiterated its statement made more than 80 years ago that the "right of subrogation * * * is independent of any contractual relations between the parties."

So-called "conventional" subrogation, unlike true equitable subrogation, arises only from contract and necessarily must be different from equitable subrogation; if it is not different, there is no occasion for a contract. Measured by this standard, it is clear that Farmers' contractual subrogation theory fails because the provisions of its contract with CCC, upon which it relies, gave it no right beyond that of true equitable subrogation. The latter right, if it existed at all, existed regardless of the contract, as shown by the *Pearlman* case.

For convenient comparison, I again reproduce the contractual provision which the majority opinion says gave

Farmers the right of subrogation against Millers:

"10. *Subrogation.* In the event of any payment under this policy the insurer shall, *to the full extent permitted by law*, be subrogated to all of CCC's rights of recovery thereof against the warehouseman and any other person or other legal entity to the extent of such payment." (My emphasis.)

This provision confers no right of subrogation upon Farmers beyond or above any such right it might have, in appropriate circumstances, under the equities of the situation. Indeed, it does not even purport to enlarge for Farmers' benefit the right of subrogation that arises from equitable considerations. For, in the language I have emphasized, the draftsman of the contract restricted the provisions to those instances where subrogation would arise as a matter of law, even in the absence of a contract.

So the provision that Farmers shall be subrogated to CCC's rights "to the full extent permitted by law" limits its subrogation to that granted by the law to the party having superior equities, for in no other way and to no other extent does the law permit subrogation; anything beyond that must be by contract. This paragraph of the contract, because of its limiting language, is nothing more than a gratuitous endorsement of the ordinary principle of true subrogation. Why the draftsman of the contract inserted it, I cannot say. He may have wanted to comfort Farmers, which was undertaking a liability of $50,000,000, by assuring it that in proper circumstances it would have the right of subrogation—that is, in cases where it might have superior equities.

From the foregoing, I think the judgment against Millers is erroneous and that Farmers, an undoubted cosurety, is entitled to judgment against Millers only for its share of the loss calculated on the proportion of its coverage of $105,000 to Farmers' coverage of $947,-200.