George T. **ROBERTSON** and Samuel E.
Southerland, Petitioners,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 12639.

United States Court of Appeals
Fourth Circuit.

Argued May 5, 1969.

Decided Aug. 28, 1969.

James H. Kelley, Washington, D. C. (Stanley P. Wagner, Jr., Bergson, Borkland, Margolis & Adler, Washington, D. C., A. Augustus Zollicoffer, Jr., and Zollicoffer & Zollicoffer, Henderson, N. C., on brief), for petitioners.

Thomas F. Howder, Atty., Federal Trade Commission (J. B. Truly, Acting Gen. Counsel, Alvin L. Berman and Robert E. Duncan, Attys., Federal Trade Commission, on brief), for respondent.

Before BOREMAN, WINTER and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

George T. Robertson and Samuel E. Southerland, tobacco warehousemen in Henderson, North Carolina, petition for review of Federal Trade Commission orders. We hold the Commission's actions, which Robertson and Southerland attack, were not a part of the adjudicative proceedings before the Commission, and that we lack jurisdiction to grant redress in this petition for review.[1] Accordingly, we dismiss the petition without prejudice to the right of the petitioners to seek relief in another forum.

In 1966 the Commission charged the Henderson Tobacco Market Board of Trade[2] and its members, including Robertson and Southerland, with restraining trade in violation of § 5 of the Federal Trade Commission Act. [15 U.S.C. § 45] The case presented the familiar problem of apportioning among the warehouses a limited amount of selling time without denying newcomers on the market an opportunity to compete effectively with the members of the Board of Trade.[3]

After extensive adversary hearings, the examiner held that the Board of Trade had adopted bylaws that illegally favored established warehouses and penalized entrants to the market. The examiner recognized that allocation of selling time was necessary for the integrity of the market, but he found vice in the Board of Trade's practice of apportioning time to established warehousemen on the basis of excess warehouse space under their control. Thus, for example, in 1965, selling time was allocated to 21 warehouses, but only 6 were used for the actual sale of tobacco. In contrast, the Board of Trade restricted the warehouse space for which an entrant would be given selling time credit. This difference in treatment of established firms and newcomers, the examiner held, watered down the time available for assignment to an entrant and to Robertson and Southerland to such an extent that it restrained trade and tended to create a monopoly.

None of the parties challenged the examiner's finding of illegality. However, the Board of Trade, individual respondents,[4] and the Commission's counsel were dissatisfied with the examiner's proposed cease and desist order, and they appealed

---

1. We previously denied, without opinion, the Commission's motion to dismiss for lack of jurisdiction. Our decision on the motion, of course, did not preclude reconsideration of the jurisdictional question after the case had been fully briefed.

2. North Carolina General Statute, § 106–465 (1966), authorizes tobacco warehousemen and purchasers of leaf tobacco at auction to organize local tobacco boards of trade to make reasonable rules and regulations, not in restraint of trade, for the handling and sale of leaf tobacco at auction.

3. See e. g., Roberts v. Fuquay-Varina Tobacco Bd. of Trade, 332 F.2d 521 (1964), 405 F.2d 283 (4th Cir. 1968); Danville Tobacco Ass'n v. Bryant-Buckner Associates, Inc., 333 F.2d 202 (1964), 372 F.2d 634 (4th Cir.), cert. denied, 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 624 (1967); Asheville Tobacco Bd. of Trade, Inc. v. FTC, 263 F.2d 502 (1959), 294 F.2d 619 (4th Cir. 1961).

4. Charges of individual wrongdoing by Robertson and Southerland were dismissed. They were, however, retained as respondents in their capacity as members of the Board of Trade.

to the Commission seeking revision of the terms of the order. While the appeal was pending, these parties jointly proposed a cease and desist order that differed in several respects from the examiner's. In addition, the joint brief supporting the proposal illustrated how surplus space could be eliminated by use of a formula that allowed each established warehouseman and entrant on the market 100% credit for his first warehouse unit (56,000 square feet), 50% for his second unit, and 25% for his third unit.[5]

Robertson and Southerland did not appeal from the examiner's decision or join in proposing the new order. Instead, they preferred the examiner's recommendations, with the exception that they favored a more liberal 100%, 75%, and 50% allocation formula.

On June 15, 1967, the Commission entered the proposed cease and desist order with minor modifications. No petition for review was filed by any party.

During the next six months, the Board of Trade adopted a series of bylaws to comply with the Commission's orders. It banned credit for non-selling warehouses, and it reached a compromise with Robertson and Southerland on a 100%–65%–25% formula for allocating selling time. But, over Robertson's and Southerland's dissent, it enacted a bylaw which provided that any warehouse in existence on the date of the Commission's order would be treated for purposes of allocating selling time as part of the warehouse firm which owned or controlled such warehouse at that time. This bylaw effectively prevented any member of the Board of Trade from qualifying existing excess warehouse space for 100% allocation of time, and it required an entrant to build a warehouse to get a 100% allowance.

Robertson and Southerland notified the Commission of their opposition to the sale and lease restriction and requested a hearing on factual and legal issues raised by the bylaws. The Commission denied the request for a hearing, and on May 17, 1968 it approved the Board of Trade's bylaws as complying with the cease and desist order of June 15, 1967. Robertson and Southerland then filed a petition for reconsideration, which the Commission denied. This petition for review was filed July 18, 1968.

Robertson and Southerland assert that the Commission's decision is arbitrary, inconsistent, and without evidentiary support. Their attack, however, is not mounted directly against the cease and desist order of June 15, 1967. Instead, it centers on the Commission's subsequent approval of the Board of Trade's bylaws. Their allegations raise substantial and far-reaching issues about the Board of Trade's regulation of the Henderson tobacco market. However, our jurisdiction to examine these charges depends on whether the Commission's approval of the bylaws was part of the Commission's adjudicative or its compliance proceedings.

Section 5(b) of the Federal Trade Commission Act [15 U.S.C. § 45 (b)] grants the Commission adjudicative authority. This section and the Administrative Procedure Act [5 U.S.C. §§ 554(b) and 556] provide for the right to notice, hearing, the opportunity to present evidence and to conduct cross-examination. The Administrative Procedure Act [5 U.S.C. § 557] and the Commission's rules [16 C.F.R. § 3.54(b)] require the Commission's decisions to include findings of fact, conclusions of law, and the reasons that support them. If the Commission finds the law has been violated, the adjudicative proceedings culminate in an order to cease and desist from using unfair methods of competition. The requirements of procedural due process found in these stat-

---

5. The examiner had suggested that all established firms (except Robertson's and Southerland's, and another firm) be prohibited from constructing new warehouses for five years. The proposed order omitted this provision. The examiner recommended the 100%, 50% and 25% allocation formula.

utes and rules apply not only to adjudication of fault, Morgan v. United States, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129 (1938), but also to formulation of remedies in cease and desist orders. Jacob Siegel Co. v. FTC, 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888 (1946).[6]

■ Section 6 of the Act [15 U.S.C. § 46] authorizes the Commission to require compliance reports to aid in enforcement of cease and desist orders. United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950). The Commission's rules furnish a detailed guide for reporting compliance [16 C.F.R. § 3.61] and expressly provide that these proceedings are not adjudicative [16 C.F.R. § 3.2]. Neither the Federal Trade Commission Act nor the Commission's rules require formal hearings at the compliance stage. Moreover, the absence of such a requirement in the Federal Trade Commission Act makes the hearing provisions of the Administrative Procedure Act inapplicable to compliance proceedings. See LaRue v. Udall, 116 U.S.App.D.C. 396, 324 F.2d 428, 432 (1963), cert. denied, 376 U.S. 907, 84 S.Ct. 660, 11 L.Ed.2d 606 (1964).

■ The Commission, we believe, acted properly in terminating the adjudicative proceedings with the entry of the cease and desist order and in treating subsequent events under its compliance procedures. Several reasons support this conclusion. The cease and desist order specifically prohibits the practices of the Board of Trade that violated the law.[7]

6. There is no question about the adequacy of the Commission's procedures from issuance of the complaint until the cease and desist order was entered. Robertson and Southerland were afforded notice and a full evidentiary hearing. The examiner's report contains all necessary findings of fact, and the reasons for his conclusions were fully stated. Although Robertson and Southerland did not appeal from the examiner's recommendations to the Commission, they were afforded an opportunity to comment on the parties' joint proposal. The Commission's opinion expresses its reason for adopting the order proposed by the parties and fully discusses the factors that led it to reject Robertson's and Southerland's suggestions.

7. The respondents were ordered to " * * * cease and desist from entering into * * * any planned common course of action * * * to do or perform any of the following acts and practices:

"1. Allocate * * * selling time to new entrant warehouses on the Henderson market on any basis * * * which refuses to give any credit to the size and capacity of a new entrant in excess of the average size and capacity of all the warehouses operating on the market;

"2. Allocate * * * any selling time pursuant to any system * * * of allocating selling time which takes into account * * * warehouse space which is not only unsuitable and unavailable, but not actually used for the sale of tobacco at auction;

"3. Allocate * * * any selling time pursuant to any system * * * which fails to accord equitable and nondiscriminatory treatment to all warehouse members on the Henderson market whether said members are established operators or new entrants;

"4. Allocate * * * any selling time to warehouses operating on the Henderson market on the basis of any system * * * with the purpose or effect of restricting * * * any person * * * from engaging in the tobacco business on the Henderson market * * *;

"5. Adopting * * * any plan * * * that restricts * * * any person * * * from engaging in the tobacco business on the Henderson market * * *;

"6. Engaging in any act * * * with the purpose or effect of restricting * * * the entrance of any person * * * from engaging in the tobacco business on the Henderson market or any other person * * * already doing business on the Henderson market, from competing therein;

"7. Engaging in any act * * * with any respondent named herein or with any other person * * * with the purpose or effect of restricting * * * competition between or among the warehouse members engaged in doing business on the Henderson market;

"8. Engaging in any act * * *, the purpose or effect of which is to effectuate any understanding * * * prohibited herein; or

"9. Placing in effect or carrying out any act * * * prohibited by any provision or part of this order, through

After its entry, all that remained to be done was to determine whether the Board of Trade's new bylaws complied with the order. Throughout this case, the Commission's function was essentially negative—to prohibit practices that violated the laws administered by the Commission. Affirmative action to regulate the market in a manner consistent with the laws of North Carolina and federal antitrust laws remained the province of the Board of Trade. There are a number of ways the Board could discharge its duty without violating the Commission's order, and for this reason the Commission left to the Board considerable discretion in selecting the means for governing the market.

It is the method selected by the Board of Trade for complying with the Commission's order that is the real basis of the complaint made by Robertson and Southerland. This method was not dictated by the Commission, and indeed in some respects it varies from suggestions made by the Commission's staff. Regulation of the market, we believe, would be unduly rigid if the Commission required an evidentiary hearing on amendments of the Board's bylaws, or if the Commission incorporated the bylaws into its cease and desist order.

The Commission did not depart from precedent in the procedure that it followed here. In cases concerning other tobacco markets the adjudicative process has ended with a cease and desist order phrased in broad and general terms. Compliance procedures have then been used to implement the order.[8]

Robertson and Southerland complain, however, that regardless of the procedure used in other cases, approval of the bylaws through the compliance reports was error here because the Commission admitted in its opinion that it did not have current market data upon which to base its approval. They assert that the data could properly be obtained only through an evidentiary hearing and that the Commission was required to make findings of fact concerning the data ultimately accepted. This argument, however, overlooks the context in which the Commission's observation concerning market data was made. The Commission was speaking of the merits of the 100%–50%–25% formula for allocation of time, as contrasted with Robertson's and Southerland's 100%–75%–50% proposal. Actually, differences in these formulas were resolved when the Board of Trade adopted the 100%–65%–25% compromise to which Robertson and Southerland gave their approval. We find nothing in the remarks made by the Commission on this issue that precluded consideration of the bylaws through compliance negotiations.[9]

---

respondent board or any other instrumentality * * *.

    *    *    *    *    *

"IT IS FURTHER ORDERED that the respondents shall, within sixty (60) days after service upon them of this order, file with the Commission a report, in writing, submitting a plan, subject to Commission approval, for allocating selling time in compliance with paragraph 2 of the Commission's order and otherwise setting forth in detail the manner and form in which they have complied with the order to cease and desist contained herein."

8. See e. g., Wallace Tobacco Bd. of Trade, Inc., 62 FTC 733 (1963) ; Asheville Tobacco Bd. of Trade, Inc. v. FTC, 57 FTC 896, *aff'd as modified*, 294 F.2d 619 (4th Cir. 1961), *order on remand*, 60 FTC 308 (1962) ; Wilson Tobacco Bd. of Trade, Inc., 53 FTC 141, 192 (1956) ; Marlboro Tobacco Bd. of Trade, 48 FTC 269, 288 (1951).

9. In its opinion, the Commission said:
    "The next point made by [Robertson and Southerland] is their objection to the proposed formula, offered as an illustration by the appealing parties for the future allocation of warehouse selling time. This proposal is not a part of the order ; it is only an illustration of the manner in which compliance with the order, which is general in its terms, could be effected, and it may not be finally adopted. As we understand the proposal, however, each of the six firms now in the market would be allocated selling time on the basis of a first unit of 56,000 square feet of suitable and available warehouse space 'actually used' for the sale of tobacco at auction, and they would

■ We therefore conclude that the Commission's adjudicative proceedings came to an end when the Commission published its opinion and entered its cease and desist order, that compliance proceedings were appropriate for consideration and approval of the Board of Trade's new bylaws, and that consequently the Commission did not err in granting approval without complying with the procedural requirements of an adjudicative hearing and decision.

■■ Our conclusion that the challenged acts of the Commission were a part of the compliance proceedings leads us to hold that we lack jurisdiction to entertain Robertson's and Southerland's petition for review. A court of appeal's authority to review a Commission's decision is conferred by § 5 of the Federal Trade Commission Act [15 U.S.C. § 45], which provides in part:

"(c) Any person * * * required by an order of the Commission to cease and desist from using any method of competition or act or practice may obtain a review of such order in the court of appeals of the United States * * * by filing in the court, within sixty days from the date of the service of such order, a written petition praying that the order of the Commission be set aside."

This statute grants to the courts of appeals authority to review only the adjudicative acts of the Commission, and the basis for review is the Commission's record of the adjudicative proceedings. In the absence of such a record, review cannot be conducted *in vacuo*. Cf. United Gas Pipe Line Co. v. FPC, 86 U.S. App.D.C. 314, 181 F.2d 796, *cert. denied*, 340 U.S. 827, 71 S.Ct. 63, 95 L.Ed. 607 (1950). Robertson and Southerland ask that we remand the case to the Commission for the development of a record of the events that have taken place since the entry of its cease and desist order and the effect of these events on the market. Although this course is superficially plausible, we decline to follow it. To do so would destroy the distinction between the Commission's adjudicative functions and its compliance procedures. The merger of compliance with the cease and desist order, which would be necessary to give us jurisdiction under the statute, would make the effective date of cease and desist orders vague and indefinite. This would result because § 5 of the Act [15 U.S.C. § 45] provides that a petition for review must be filed within 60 days from the service of a cease and desist order, and that the order will become final upon expiration of the time allowed for filing the petition if none has been filed, or if review has been sought, upon completion of the judicial proceedings. Engrafting compliance proceedings—which in this case lasted 11 months—on cease and desist

also receive additional but decreasing allocations of time for the second, third and subsequent units, if any. New entrants would be allocated selling time on the same conditions and without discrimination.

"If this method of allocation were to be adopted, it is our understanding that [Robertson and Southerland], who built extra warehouse space to qualify for selling time under the old rules, would be able to count such space toward selling time pursuant to the formula. Under such a procedure, [Robertson and Southerland] would be on an equal footing with the other firms even if the less liberal formula of 50 percent for the second unit and 25 percent for other additional units is used. Nevertheless, we will not make the final decision on that question here. We believe that in the circumstances it is preferable to adopt the form of order proposed by the parties, which contains general proscriptions, rather than to issue an order with specific requirements on such matters as the allocation of selling time. For one thing, we do not have sufficient current market data to determine at this time the appropriateness of one method or formula over another. Moreover, it is the responsibility of the board and its members, under North Carolina law, to adopt proper regulations, which regulations, of course, must also comply with the laws administered by the Commission. It seems to us that the matter of selling time allocation is more in the nature of a detail of compliance. Our final determination on this, therefore, will be made upon the submission of compliance reports."

orders to toll the 60-day period for application for judicial review would negate the statutory scheme that provides finality to the adjudicative function of the Commission.

The result we reach is in accord with Rettinger v. FTC, 392 F.2d 454 (2d Cir. 1968). There the Commission, after 10 years, made compliance with a cease and desist order more onerous than it previously had been. Rettinger sought to treat the change as a reopening of the proceedings so that he might have review in the court of appeals. The court, however, declined to hold that an interpretation of what constitutes compliance is a reopening of the proceedings envisioned by § 5, and dismissed the petition for lack of jurisdiction. Magnaflo Co., Inc. v. FTC, 120 U.S.App.D.C. 36, 343 F.2d 318 (1965), upon which Robertson and Southerland rely, does not require a contrary conclusion. There the court decreed that the cease and desist order should be enforced pending remand to the Commission for further hearings on an alternative form of relief. In that case, however, the petition for review was filed within 60 days after the entry of the cease and desist order, so the court was not confronted with the question of jurisdiction.

Robertson and Southerland are not, however, without a remedy. Nothing that we have said is intended to prevent them from seeking injunctive or declaratory relief under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, in the district court. See Rettinger v. FTC, 392 F.2d 454, 457 (2d Cir. 1968); United Gas Pipe Line Co. v. FPC, 86 U.S.App. D.C. 314, 181 F.2d 796, 799, *cert. denied,* 340 U.S. 827, 71 S.Ct. 63, 95 L.Ed. 607 (1950). Cf. Utah Fuel Co. v. Nat'l Bituminous Coal Comm., 306 U.S. 56, 59, 59 S.Ct. 409, 83 L.Ed. 483 (1939); 3 Davis, Administrative Law § 23.02 (1958). Upon their complaint that the Commission acted arbitrarily and capriciously after the entry of the cease and desist order, the district court can develop a record and reach a decision that will give due consideration not only to Robertson's and Southerland's situation, but also to the public interest. In Roberts v. Fuquay-Varina Tobacco Bd. of Trade, 405 F.2d 283, 285 (4th Cir. 1968), we said:

> "The warehousemen have an economic stake in the markets' operations, but the markets exist for the purpose of serving the interests of buyers and sellers of tobacco. Those interests, we think, deserve inquiry and consideration in an appraisal of any plan containing market restrictions and limitations."

Here, the district court must subject the Commission's sanction of the Board's regulatory bylaws to no less rigorous scrutiny.

The petition for review is dismissed without prejudice.